## STANDARD LIME & STONE CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 4319.

Circuit Court of Appeals, Fourth Circuit.

June 13, 1938.

Charles Markell, of Baltimore, Md., and Harry H. Byrer, of Martinsburg, W. Va. (Lacey I. Rice, of Martinsburg, W. Va., on the brief), for petitioner.

Clifford D. O'Brien, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp and Owsley Vose, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The National Labor Relations Board ordered the Standard Lime and Stone Company to bargain collectively with Branch No. 175, Quarry Workers International Union of North America, as the exclusive representative of all the employees at its Martinsburg plant; and upon application to offer to employees who were on strike on July 15, 1935, immediate and full rein-

statement to their former positions dismissing, if necessary, such employees as it had hired since July 15, 1935. The order of the Board was not passed until February 4, 1938. From the order were excepted eight former employees who, upon pleas of guilty, had been given indeterminate sentences of from one to ten years in the penitentiary for feloniously conspiring to destroy and feloniously destroying the property of a power company which served their employer's plant or for the larceny of dynamite to be used in the perpetration of the crime. But the order required the employer to re-employ, upon application, eight other employees, including the president, the corresponding secretary and the secretary-treasurer of the Union, who, upon pleas of guilty, had been sentenced to jail for conspiring to destroy the property of the power company, or for assault and battery upon fellow employees.

All of these crimes were committed by members of the Union for purposes of intimidation in furtherance of the strike; and all were committed before July 15, 1935, when, according to the finding of the Board, the employer infringed the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., by refusing to bargain with the Union. The principal questions which arise are: (1) Whether the Board was justified by the evidence in finding that the employer was guilty of unfair labor practice on July 15, 1935; and (2) if so, whether the Board was justified in directing the employer on February 4, 1938, to offer re-employment to all of the strikers except the eight who had been convicted of felony.

The Standard Lime and Stone Company has its main office at Baltimore, and operates amongst other properties a plant near Martinsburg, West Virginia, where it is engaged in quarrying limestone and in the manufacture of cement, staflux and other limestone products. Limestone and shale are quarried at the plant, but gypsum and mill scale, constituting a small percentage of the materials used in the manufacture, are brought from New York, Pennsylvania and New Jersey. During 1935, 83% of the products of the plant was sold and distributed in states other than West Virginia. It seems clear that the company is subject to the terms of the Act, and no contention to the contrary is made. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 301 U.S. 49, 57 S.Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Santa Cruz Fruit Packing Co., 9 Cir., 91 F.2d 790, affirmed by the Supreme Court on March 28, 1938, 58 S.Ct. 656, 82 L.Ed. ——.

The Union was formed among a substantial group of the employees in 1933. It was recognized by the company. Representatives of both sides met periodically to discuss grievances and until April, 1935 difficulties that arose were satisfactorily adjusted. During March of that year, officials of the company met with a committee of the Union two or three times a week to discuss the terms of a proposed agreement providing for a closed shop, wage increases and other features relating to working conditions. A draft of the agreement was submitted to the company on April 2, 1935, and for three weeks meetings for the discussion of its terms were continued. The discussion centered upon the provision for a closed shop and a proposal of the Union that the final terms should be incorporated in a written contract. On April 23 the committee of the Union informed the company that a strike would be called on April 24 unless the company would consent to a signed agreement, but the company refused. The company then endeavored to get a conciliator from the U. S. Department of Labor. None was available until April 26. But the Union refused meanwhile to postpone the strike, and it was accordingly called. At that time the Union represented 98% of the 390 employees. The company shut down the plant.

The conciliator arrived on April 26 and conferences were resumed. He suggested that the men return to work during further negotiations and that a copy of the terms eventually agreed upon be sent to the Department of Labor and a copy posted on the company's bulletin board. But this suggestion was unacceptable to the Union. A second fruitless conference took place in May and another on June 3 when the Union offered to give up its demand for a closed shop; but the question of a signed agreement proved insuperable.

On June 9 a few men asked the superintendent of the mill to reopen the plant and they were told to get the Union to vote

upon the question. What effort they made to secure an election is not clearly shown by the evidence; but no vote was taken. On June 11 another conference was held at which the superintendent announced that as the Union would not permit a vote, he would open the plant and give those who desired to return to work an opportunity to do so; and he read an advertisement which was to be inserted that evening in a local newspaper wherein all employees were invited to return at the rate of pay previously existing and were advised that they must report for work on June 13 or they would be considered as no longer in the company's service.

On June 13 the plant reopened and 23 employees returned to work. At 7 o'clock in the morning the Union had 250 pickets at the entrance to the plant. A group of state police were also present at the request of the sheriff of the county, and they continued surveillance of the plant until July 26, the number of pickets gradually diminishing in the meantime. Picketing was finally abandoned in the middle of September. There was no violence during working hours on June 13. The police found 11 quarts of ammonia concealed under rubbish in the midst of the strikers, and they induced the strikers to throw away 50 or 60 clubs with which they were armed. Subsequently, acts of violence occurred. On the evening of June 13 an old colored man who had worked for the company 35 years was beaten by strikers, and later in the month there were two other assaults on workers for which certain strikers subsequently pleaded guilty. One of these was the secretary-treasurer of the Union. Dynamiting of the power lines leading to the plant occurred on June 19 and 26. Later the president and corresponding secretary of the Union pleaded guilty to conspiracy to dynamite the power lines and other strikers confessed the perpetration of the overt act. These acts of violence and many threats from unidentified persons instilled a sense of fear in the company's workers. As a result, the company quartered a number of the employees at the plant, additional guards were hired and an auxiliary lighting system was procured in order to protect the workers. Those who did not remain at the plant were transported to and from work in buses hired by the company and were permitted to enter the plant only upon the presentation of passes.

Having notified its employees to return to work on June 13, and having succeeded in opening its plant, the company took the position that the strikers were no longer its employees. Accordingly, it declined to attend a conference on June 17 which another conciliator of the Department of Labor, an international officer of the Union and the president of the West Virginia Federation of Labor sought to arrange. On July 5, the National Labor Relations Act went into effect. On July 15 the local Union, by letter, requested the company to confer with its representatives for the purpose of obtaining "a settlement of the present labor difficulties". The company ignored this request; and it is this action which the Board found to be a refusal to bargain collectively with duly designated representatives of a majority of its employees in respect to conditions of employment. As a result, the Board reached the conclusions of law that the company had violated the Act, in that it had committed unfair labor practices under Section 8 (1) and Section 8 (5) of the Act, 29 U.S.C.A. § 158 (1, 5), by interfering with its employees in the exercise of the right to bargain collectively granted them by Section 7 of the Act, 29 U.S.C.A. § 157, and by refusing to bargain collectively with them.

In view of the attitude of the employer, the first question which presents itself is whether the strikers may be considered as employees of the company on July 15 when the alleged unfair labor practice took place. The term "employee" as defined in Section 2(3) of the Act, 29 U.S.C.A. § 152(3), includes "any individual whose work has ceased as a consequence of, or in connection with. any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment". It is manifest that the strikers did not quit because of any unfair labor practice. None prior to July 15 is charged, and in any event the Act did not take effect until after the strike had begun. We think, however, that the other alternative in Section 2 (3) is applicable since the dispute was still current on the crucial date. In a similar situation we held it to be immaterial that before the Act was passed, a strike had begun and work had been resumed with a warning to the strikers to return to work if they desired to remain employees. Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 112 A.L.R. 948. See, also, National Labor Relations Board v. Mackay

Radio & Telegraph Co., 58 S.Ct. 904, 82 L.Ed. ——, decided by the Supreme Court May 16, 1938. Notwithstanding such occurrences, a labor dispute may remain current; and that it was still current in the pending case on July 15 is indicated by the continued efforts of the strikers, their willingness to negotiate and the conceded fact that it was not until the end of July that the employer secured a full complement of workers.

 But it is still necessary to inquire whether on July 15 Branch No. 175 of the Union was a unit entitled to conduct collective bargaining on behalf of the striking employees. Section 9 (a) of the Act, 29 U.S.C.A. § 159 (a), provides that representatives designated for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in the unit for the purposes of collective bargaining. There is no dispute that Branch 175 was an appropriate unit for this purpose if in fact it represented a majority of the employees at the time. On this question of fact the Board said:

"Although the record does not show the number of persons employed by the respondent on July 15, it does show that during the entire month of July 1935 the respondent employed 252 persons. The record also shows that by the end of August, 1935 only 119 strikers had been reemployed although the employment figure during this month had risen to 299. By subtracting the number of strikers that had returned to work by the end of August, 119, which included all of those who had applied for work, from the total number of members of Branch No. 175 who went out on strike, 379, we find that at least 260 members of Branch No. 175 were still on strike on July 15. This figure is clearly a minimum figure as it is probable that on July 15 something less than 119 strikers had returned to work. In any event, it is clear that these 260 strikers constituted a majority of the respondent's employees on July 15, if the strikers are properly included as employees."*

In our opinion, this finding of fact is insufficient to show that on July 15 the Union represented a majority of the employees within the fair meaning of the Act. In the first place there is no showing as to the number of employees who had obtained substantially equivalent employment elsewhere. Workers who had obtained such employment before July 15 were no longer employees of the company on that date under the express terms of Section 2(3) of the Act, 29 U.S.C.A. § 152(3), and could not be counted in the majority necessary to qualify the Union as a representative bargaining agency. In view of the interval of nearly three months which had elapsed since the beginning of the strike on April 24, it is not unreasonable to suppose that some of the strikers had gone to work elsewhere; and as the complainant was relying on a majority of only 8, the excess of 260 strikers over 252 workers on July 15, the obligation rested upon it to show that no considerable number of strikers had found other work. There was, however, no evidence whatsoever on the point.

 It is suggested that this defect in the evidence was not urged before the Board and should not now be considered, by reason of the provision of Section 10(e) of the Act, 29 U.S.C.A. § 160(e), that an objection not urged before the Board shall not be considered by the court. But even if the point be disregarded, it is clear that in counting the majority necessary to qualify the Union as a bargaining agency, the 16 strikers who had been convicted of crimes, designed to destroy property and to terrorize the workers, should not be included. The company had announced that it would not consider any worker as an employee who failed to return to work on June 13. In this broad position it was not justified, as we have already indicated; but on July 15, when the request of the Union for further negotiations was made, it could lawfully decline to recognize as employees confessed offenders who had previously broken the law. The right of an employer to discharge or to refuse to reinstate a man who has committed a crime which endangers the safety of his fellow workers or the integrity of the plant cannot be successfully challenged. The statute does not purport to destroy this right, or contemplate that an employer must continue to employ or to treat as employees men who have engaged

---

*It is true that the record does not show the precise number of employees at work on July 15 or the precise number of strikers who had returned by that date. Hence we assume in this discussion, as did the Board, that 252 were then at work in the plant and 260 men were still on strike.

in unlawful conduct of this character. Nor would such an interpretation effectuate the policies of an act designed to remove the sources of industrial strife by encouraging the friendly adjustment of industrial disputes. Sections 1 and 10 (c) of the Act, 29 U.S.C.A. §§ 151, 160 (c).

■ In explanation of its order directing the company to reinstate the 8 men who had confessed participation in the conspiracy to blow up the power lines or the commission of assaults upon workers at the plant, the Board had this to say:

"With the exception of the 8 men who pleaded guilty to the commission of a felony and were given an indeterminate sentence of one to ten years in the state penitentiary, we cannot concur in the respondent's contention that these individuals have disqualified themselves from reemployment. The Board's power to order the reinstatement of employees is equitable in nature, to be exercised in the light of all of the circumstances of the case. Here the respondent itself has violated the law of the land. Under all the circumstances and without condoning the illegal acts of the strikers, we feel that such acts should not be a bar to the reinstatement of any except the 8 mentioned above."

We find nothing in the Act to support this assertion of power on the part of the Board, and we perceive no equitable circumstance to justify its exercise in this case. The Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, said:

"The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion."

In Associated Press v. National Labor Relations Board, 301 U.S. 103, 132, 57 S. Ct. 650, 655, 81 L.Ed. 953, the court said:

"The act does not compel the petitioner to employ any one; it does not require that the petitioner retain in its employ an incompetent editor or one who fails faithfully to edit the news to reflect the facts without bias or prejudice. The act permits a discharge for any reason other than union activity or agitation for collective bargaining with employees. The restoration of Watson to his former position in no sense guarantees his continuance in petitioner's employ. The petitioner is at liberty, whenever occasion may arise, to exercise its undoubted right to sever his relationship for any cause that seems to it proper save only as a punishment for, or discouragement of, such activities as the act declares permissible."

See also Appalachian Elec. P. Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985, 989.

■ It is contended that the employer failed also to raise this objection when the case was before the Board. The contention is without substantial foundation. The status of the 16 men convicted of crime was the subject of special consideration by the Board, as we have seen, and it was vigorously contended by the employer that the lawless acts of the strikers had put an end to the relationship of employer and employee. But the Board gave no heed to the argument. It not only counted all 16 men, in computing a majority for the Union, but went to the greater length of ordering the employer to offer to 8 of them reinstatement as workmen in the plant, notwithstanding the fact that the crimes of all had taken place before the refusal to negotiate occurred. The position of the Board on both questions—the right of the Union to negotiate and the reinstatement of the convicted men—was made abundantly clear in its opinion, and no further proceedings before the Board on either point are required.

■ We find no substantial evidence in the record to show that the Standard Lime and Stone Company violated the rights conferred upon employees or failed to perform the obligations imposed upon employers by the National Labor Relations Act. For a long period before the passage of the Act, the company had recognized the right of its employees to bargain collectively through the Union as their representative. The only charge against the company was its failure after the enactment to continue to bargain collectively in response to the Union's request of July 15; but before this request was made, the acts of violence and breaches of the criminal law instigated by officials of the Union had taken place. The Union was therefore no longer entitled

to recognition since it could no longer speak for a majority of the men whom the company was required to recognize as its employees for the purpose of collective bargaining. If only the 8 men guilty of felony are deducted from the total of 260 Union men, the number remaining· is 252, which exactly equals the number of workers at the company's plant; and if all 16 of the convicted men are deducted from the Union's total, as we think they. must be, the workers constitute a clear majority. For these reasons the conclusion of the Board that the company had been guilty of unfair labor practice cannot be sustained.

The employer also makes the defense that even if it was guilty of unfair labor practice on July 15, 1935, the Board was not justified in directing it on February 4, 1938, to offer re-employment to any of the strikers who left its employ on April 24, 1935. The basis for this defense is the fact that on June 16, 1936, the Union, with the consent of the Board, withdrew its charge and dismissed the complaint without prejudice to its right to refile the charge; that the case remained in abeyance thereafter until May 19, 1937, and that in the meantime, the employer as a matter of course continued the operation of the plant and hired additional employees with reason to believe that the controversy was at an end. It is, however, not necessary to consider this point in view of the conclusion reached that no unfair labor practice was committed.

A decree will be passed setting aside the order of the Board.