FANSTEEL METALLURGICAL CORPO-
RATION v. NATIONAL LABOR RE-
LATIONS BOARD.
No. 6606.

Circuit Court of Appeals, Seventh Circuit.
July 22, 1938.

Benjamin V. Becker, Max Swiren, Don M. Peebles, and Harold M: Keele, all of Chicago, Ill., Sidney H. Block, of Waukegan, Ill., and Carus S. Icenogle, of Mattoon, Ill. (Max Swiren, of Chicago, Ill., of counsel), for petitioner.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp, Ruth Weyand, and Lawrence Hunt, all of Washington, D. C., for National Labor Relations Board.

Before SPARKS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

This is a statutory proceeding for a review of an order of the National Labor Relations Board. The order was entered by the Board on March 14, 1938, under the National Labor Relations Act of 1935, 29 U.S.C.A. chapter 7, § 151 et seq. and the petition was filed pursuant to section 10(f) of that Act. 29 U.S.C.A. § 160(f).

The order was the result of the filing on September 15, 1936, of a general charge of unfair labor practices affecting commerce, against petitioner, by local 66 of the Amalgamated Association of Iron, Steel and Tin Workers of America, and the filing, on May 21, 1937, of an amended charge specifically setting forth unfair labor practices in violation of section 7, and subsections 1, 2, 3 and 5 of section 8 of the Act, 29 U.S.C.A. §§ 157, 158(1–3, 5). On May 25, 1937, the Board issued a complaint against petitioner, and gave notice of a hearing to be had on June 7, 1937, at Waukegan, Illinois.

The complaint alleged, in substance, that the petitioner had engaged and was engaging in unfair labor practices affecting commerce within the meaning of section 8, subdivisions (1), (2), (3), and (5) and section 2, subdivisions (6) and (7) of the National Labor Relations Act, 29 U.S.C.A. §§ 152(6, 7), 158(1–3, 5), in that (a) petitioner hired one Alfred Johnstone, an agent and operative of the National' Metal Trades Association, for the purpose of espionage, intimidation, interference, spying, and reporting upon the activities and membership of petitioner's employees in the Union; (b) petitioner employed one A. J. Anselm as superintendent of its plant for the purpose, among other things, of breaking up the Union; (c) petitioner physically isolated one of its employees,

John Kondrath, who was president of the Union, from the other employees at the plant, and forbade him to associate or talk with them; (d) petitioner on September 10 and 21, 1936, and February 17, 1937, and at all times thereafter, refused to bargain collectively with the Union as representative of its employees although for some time prior to September 10 and at all times thereafter the Union had been designated by a majority of petitioner's employees in the appropriate unit as their representative for collective bargaining; (e) petitioner on September 10, 1936, and thereafter attempted to organize a labor organization among its employees and to that end threatened its employees with loss of employment if they failed to join such organization; (f) petitioner on or about February 27, 1937, and thereafter until the issuance of the complaint, sent various persons to the homes of its employees who because of the foregoing unfair labor practices had theretofore, on February 17, gone on strike, and offered to reinstate such employees as individuals if they would abandon the rights guaranteed them by section 7 of the Act, 29 U.S.C.A. § 157; (g) petitioner on February 17, 1937, discharged 92 named employees, and on February 27, 1937, and thereafter, refused to reinstate them, because of their Union affiliation and organizational activities; (h) petitioner on and after February 27, 1937, caused to be organized, and dominated, supported, and interfered with, a labor organization of its employees known as Rare Metal Workers of America, Local No. 1.

Petitioner answered denying all the allegations of the complaint, and averred with respect to the alleged discharge of employees that it had discharged and refused to reinstate them for cause, in that, during and in connection with the strike they had seized petitioner's plant and by force and violence retained possession of it and resisted arrest; that the persons engaged in the illegal seizure and occupancy of petitioner's buildings on February 17, 1937, were on that date, upon their refusal to vacate the premises, discharged for the seizure and retention of the plant and for no other reason; that petitioner was under no duty to reinstate those who had either participated in the plant seizure and been discharged therefor, or had aided and abetted in the illegal and violent retention of the plant with full knowledge of the injunction; that petitioner was not obliged to reinstate certain of the individ-

uals named in the complaint by reason of their inefficiency in performing their required duties; that petitioner's plant had undergone an internal reorganization in which there had been abolished, for efficiency purposes, a number of positions formerly occupied by certain of the persons named in the complaint; that Lodge 66 was not on the dates in question the bona fide representative of a majority of its employees and accordingly was not the proper bargaining agency; and that Rare Metal Workers of America, Local No. 1, was organized and conducted without any support, domination or interference from petitioner.

Pursuant to the notice the hearing was had before a Trial Examiner who, on September 2, 1937, filed his report finding that petitioner had engaged in and was engaging in unfair labor practices within the meaning of section 8, subdivisions 1, 2, 3 and 5 of the Act, and recommended that petitioner cease and desist from such practices and take certain affirmative action to remedy them. A general statement of the facts adduced before the Examiner will be helpful in appraising the Board's findings and conclusions.

The petitioner was and is engaged in the production, processing and fabrication of rare metals in North Chicago. In its principal departments its work is highly technical and scientific. During the summer of 1936, Local 66 was formed by a small group of petitioner's employees, with the aid of field representatives of the Amalgamated Association of Iron, Steel and Tin Workers of America. Following a membership drive a committee of Local 66 met with petitioner's plant superintendent, Anselm, on September 10, 1936. It presented a contract containing provisions for regulation of working conditions, a closed shop, check-off system and recognition of the union. The superintendent objected to the closed shop and check-off provisions. He also took exceptions to the recognition of an outside union, and asked the committee to consider an employees' representation plan. The closed shop demand was subsequently withdrawn, but the superintendent declined to acquiesce in the other demands. The committee, accompanied by its organizer, called again on September 21, 1936, but no agreement was entered into. On neither of these dates did Local 66 represent a majority of petitioner's production and maintenance employees, which was the unit for which the demands were made.

No further meetings were held or requested until February 17, 1937. That morning a large committee of Local 66 presented to Anselm a request for recognition of their union. He rejected the request and suggested that they return at 2 P. M. They returned at that time, and he announced there was no change in the company's position. He questioned the constitutionality of the National Labor Relations Act, and called their attention to the fact that the Supreme Court had not yet ruled upon its validity. No agreement having been reached, the committee withdrew and held a brief secret meeting in the chemical building, wherein it was determined to engage in a sit-down strike.

Within half an hour after the afternoon conference began, about one hundred men seized two key buildings of the plant. Foremen and other employees were requested to leave with the warning that they had better do so peaceably. The buildings were then locked and barricaded from the inside, which effected a complete stoppage in the operations of the entire plant.

About four hours after the seizure, Anselm, accompanied by the company's counsel and two police officials, sought entrance into the buildings and demanded surrender of possession. Upon the occupants' refusal, counsel for the petitioner, by order of its president, announced to the occupants in loud tones that all of the men remaining within the buildings were discharged for the violent seizure and retention of the buildings. It was stipulated that at the time of such discharge the number of occupants, their identity and their union affiliations, if any, with eight or ten exceptions, were totally unknown to petitioner or anyone connected with its management, and that the discharge was a blanket discharge of all the men then in occupation of the buildings.

That same evening there were passed into the buildings written notices that the next morning petitioner would apply to the Circuit Court of Lake County, Illinois, for a temporary injunction against the continued illegal occupancy of its property. This was done, and after a hearing, at which counsel for Local 66 and the individual defendants appeared and were heard, the court found that the seizure and occupancy were illegal. Thereupon a

mandatory injunction was issued directing the occupants of the buildings to vacate them and restore possession to petitioner. The sheriff, accompanied by several deputies, went to the buildings and attempted to gain entrance to serve and execute the writ, but all were refused by the occupants. The sheriff and his deputies then read the writ to the occupants, and passed copies of it into the buildings through the open windows. The occupants refused to comply with the injunction and announced their intention to remain in the buildings. Thereupon the court issued a writ of attachment for the occupants to show cause why they should not be held in contempt. On the morning of February 19, 1937, the sheriff, accompanied by about one hundred deputies, attempted to serve the writ. They read it to the occupants, but they refused to come out of the building. Thereupon the officers attempted to force an entrance into one of the buildings. With axes and battering-rams they succeeded in breaking down one door, but they were met by pressure streams of fire extinguishing chemicals fed from large tanks and directed by the occupants. At the same time the occupants in the upper floors of both buildings began bombarding the officers with large quantities of sulphuric acid and heavy steel and iron missiles, including pipes, bolts, nuts, reamers, wire reels and sharp end tools. The sulphuric acid was poured from the windows and hurled in quart bottle containers at the officers, as a result of which some of the officers were burned by the acid, and others were injured by the missiles. To protect his men, the sheriff withdrew and employed tear gas in an effort to dislodge the occupants. This served only to increase the intensity of the barrage of missiles and acid, and the officers were compelled to leave without carrying out the court's order.

The sit-down strikers continued their occupancy of the buildings until the morning of February 26, 1937, when the officers again returned and attempted to gain entrance. This was met by a like resistance of the occupants, but more violent in its character. It was stipulated at the hearing that the officers were then compelled to use tear and emetic gas, and by so doing they succeeded in accomplishing the eviction, and restoring possession to the petitioner. It was further stipulated that fourteen of the men named in the Board's complaint, knowing of the injunction, procured and delivered to the occupants the food, equipment and supplies which enabled them to retain possession of the buildings. Sixty-six of the men named in the complaint were admittedly participants in the seizure and retention of the plant, and had full knowledge of the injunction.

After their eviction those occupants who could be found were seized by the sheriff under the writ of attachment, and were subsequently tried for contempt by the Circuit Court of Lake County. Thirty-seven of the men who participated in the seizure of the plant were convicted and fined in sums ranging from $100 to $300, and sentenced to jail imprisonment for respective terms ranging from ten to one hundred eighty days. An appeal from this judgment was prosecuted to the Appellate Court of Illinois, and the judgment was affirmed May 10, 1938. Fansteel Metallurgical Corporation v. Lodge 66 of Amalgamated Ass'n of Iron, Steel & Tin Workers of North America et al., 295 Ill. App. 323, 14 N.E.2d 991. The hearings on contempt with respect to the other occupants were continued until further order of the court. There ensued a full hearing on the merits of the case and a decree was entered adversely to the defendants in that case. No objection to that decree was interposed, and no appeal therefrom has been prosecuted.

The record discloses the following losses directly suffered by the petitioner, as a result of the men's participation in the seizure, retaining possession of the plant, and resistance to the officers. Most of the windows and many of the sashes were broken to obtain air in combatting gas, and to provide openings for throwing missiles at the officers. Numerous small tools and parts were lost; large quantities of acid, 50,000 valuable contact points and other inventory materials were lost or rendered useless by being dropped from the windows; two furnaces were permitted to cool rapidly and burn out; foamite and other chemicals from the fire extinguishers damaged the buildings and ruined a large Niagara shear; and other physical injury was occasioned by the use of the buildings for living quarters. Uncontradicted evidence of petitioner's president disclosed that the injury to buildings, equipment and inventory amounted to more than $10,000; the loss of fixed charges and overhead expense amounted to $20,000; and loss through inability to make shipments amounted to $30,000. Within ten days aft-

er the eviction, operations were resumed, and the president made the following statement:

"* * * From a preliminary inspection and survey of plants three and five, we have arrived at the tentative conclusion that:

"(1) There has been no major injury to the machinery itself.

"(2) Materials, parts and supplies of an approximate value of $25,000 have been destroyed or otherwise rendered useless.

"(3) Physical injury to the buildings themselves, including broken window panes, has resulted in damage of approximately $7,500 * * *

"All of the men who participated in the sit-down strike were discharged by the company. It has been the company's consistent belief that more than half of the 80 men who participated in the seizure of the plants were compelled to do so through coercion and intimidation. Applications for re-employment from such men will receive favorable consideration.

"We cannot condone the defiance of the courts or the resistance with violence to the enforcement of the law. For the men who participated in such unlawful activities, there can be no place in our plant. * * *"

Twelve of the men who had voluntarily left the buildings before the eviction, and twenty-three who remained until evicted, filed applications for re-employment and were hired. None of those sentenced for contempt was re-employed. Many old employees returned and the vacant places were filled by new applicants. Sixty-one men and women who returned to work were members of Lodge 66, and were reinstated without any condition as to union membership or activity.

When the plant was reopened changes were made in the interest of more economical operation. As a result thereof numerous jobs were abolished, others were materially altered and substantial savings were effected in many departments.

About the middle of April 1937, hourly production employees of appellant organized the Rare Metal Workers of America, Local No. 1. Supervisory employees did not directly participate either in the organization of that union, or the management of its affairs. However, petitioner did suggest the organization of such a union, and expressed its approval of Local

No. 1, when informed of its inception. Local No. 1 was accorded the use of petitioner's mimeograph machine for printing ballots, and the use of its bulletin boards for posting notices. Its two first meetings and its election for selecting a bargaining agent were held in petitioner's buildings, and immediately thereafter it was recognized by petitioner as the collective bargaining agent for the employees, although the Lodge never attempted to bargain with petitioner.

The Board found that approximately seventy per cent of the petitioner's business constituted or directly affected interstate or foreign commerce; that petitioner employed a labor spy to engage in espionage within the Union, and physically isolated its president from the other employees at the plant, thereby interfering with, restraining and coercing the employees within the meaning of section 8 (1) of the Act, 29 U.S.C.A. § 158(1); that on February 17, 1937, and at all times thereafter a majority of petitioner's employees within the unit found by the Board to be appropriate, had designated the Union as their collective bargaining representative, within the meaning of section 8(5) of the Act, 29 U.S.C.A. § 158(5); that, as a result of the foregoing labor practices, the employees went on strike on February 17, 1937, taking over and holding from that date until February 26, two of petitioner's key buildings, on which last date they were evicted by the officers, pursuant to an injunction issued by the state court; that although the strikers resorted to violence in resisting arrest and eviction by the officers, no sabotage of equipment occurred; that at the outset of the strike petitioner announced that all strikers who remained in the plant were discharged, but that this did not constitute a discharge in fact, and the strikers at all times remained employees of petitioner; that on March 3 and 5, petitioner again refused to bargain collectively with the Union, but sent agents among the strikers to certain of those who had participated in the sit-down strike, and resisted eviction, as well as others, requesting them to return to work, individually, under the conditions existing at the time the strike was called; that at the time of the hearing, although the plant had then been reopened and in operation for several months, the 92 strikers named in the complaint were still out on strike. Many of them had refused the solicitation of petitioner's agents to return

to work insisting that before they would do so petitioner first should recognize the Union and bargain collectively with it.

It was further found that petitioner had dominated and interfered with the formation and administration of the Rare Metal Workers of America, Local No. 1, and had contributed support to it, in violation of Section 8(2) of the Act, 29 U.S.C.A. § 158(2).

The Board found that none of the persons named in the complaint was discharged or denied reinstatement by reason of union membership or activity, and the discharge of the men in occupancy of the buildings for their seizure and retention of the petitioner's plant was held not to constitute a discriminatory discharge.

It also found that neither on September 10 nor on September 21, 1936, did Lodge 66 represent a majority of the employees in the appropriate unit.

On February 17, 1937 (the day of the plant seizure), membership in Lodge 66 was found to exceed a majority of the employees in the appropriate unit and the Board held that by failing to bargain with Lodge 66 on that date petitioner engaged in an unfair labor practice. The decision states that while some of the employees returning to work may have abandoned membership in Lodge 66, the petitioner must nevertheless now recognize and bargain with Lodge 66 as the representative of all of its employees.

Having found that the petitioner failed to bargain collectively with Lodge 66 on the day the sit-down strike occurred, the Board ordered the status quo on that day restored. The petitioner was directed, upon application, to re-employ all individuals who ceased work on that day.

The Board declined to award any back pay, upon the grounds that the petitioner had not been guilty of discrimination and no application for reinstatement had been made. On the matter of reinstatement the Board's decision made no reference to the discharge. It merely required reinstatement of all who ceased work on February 17, regardless of their conduct, including the thirty-seven who were convicted and sentenced, upon the ground that petitioner's failure to bargain on February 17, was the moving cause of the employees' conduct. With the internal reorganization and resultant continuance of jobs the Board took no notice other than to suggest that after the reinstatement as ordered, the petitioner might then reorganize or reduce its staff.

The record in this case is voluminous, and our problem is to determine whether there is substantial evidence to support the findings that petitioner violated the provisions of section 7 and section 8, subsections (1), (2), and (5) of the Act.[1] A perusal of the evidence convinces us that there is substantial evidence to support the finding that petitioner employed men to engage in espionage within the Union, and thus interfered with, restrained and coerced its employees within the meaning of section 8(1). It may also be said that there is substantial evidence to support the finding that petitioner contributed support to the organization of the Rare Metal Workers of America, Local No. 1, in violation of the literal interpretation of section 8(2). With the weight of the evidence on these questions we are not permitted to concern ourselves.

With respect to the Board's findings and conclusions relating to petitioner's violation of section 8(5) we are unable to

---

[1] Sec. 7. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Sec. 8. "It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [section 157 of this title].

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or

other support to it: * * *.

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a) [section 159(a) of this title]."

Sec. 9 "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment * * *." 29 U.S.C.A. §§ 157, 158(1, 2, 5), 159(a)

concur, because some of the facts upon which the conclusions are said to be based are not only not supported by substantial evidence, but the contrary is undenied. The difference of opinion in this respect arises over the questions whether petitioner had good cause to discharge the sit-down strikers on February 17, and, if so, did the petitioner at that time discharge them? There seems to be no denial by the Board that there was ample cause for discharge. Indeed, in the argument before this court the Board admitted that the men in conducting a sit-down strike and resisting the officers "did a foolish and illegal act." Certainly it cannot be denied that an employer is warranted in discharging his employees, and severing that relationship, when they take and retain exclusive possession of his property against his will. They had a complete and adequate remedy, without cost to them, at the hands of the Board, by the use of which they would have lost nothing in time or wages, if their cause were just. The employer had no coordinate right in this respect. The employees, however, spurned this legal remedy, disregarding all law on this subject and essayed to settle the difficulty according to their own sense of right and justice, and contrary to the better thought of those who really have at heart the best interests of all laborers. In this they violated the law which they now seek to enforce against petitioner. We are convinced that petitioner was warranted in discharging the employees, and we are compelled to so hold in order to avoid placing our approval upon such activities as they engaged in. To do otherwise would be an injustice not only to the employer, but to the unions and their friends who wish them well.

■ Appellee contends that the petitioner did not actually discharge the employees. It is not denied, however, that it told them they were discharged, and why. The reason given was not that they were striking, or that they were members of a union, or that they were attempting to organize petitioner's plant, or that they were seeking to bargain with it with respect to wages, hours or conditions, but, in language which could not be misunderstood, they were notified that it was because of their violent seizure and retention of the buildings. The Board seeks to parry the force of this notice by finding that petitioner did not really intend it as a discharge, and that the occupants did not think that it was so intended. This conclusion is not claimed to be based upon any direct statement to that effect by any representative of the company, but upon certain subsequent circumstances from which it is said petitioner's negative intention may rationally be inferred. For instance it is said, and truly, that petitioner afterwards re-employed many of these occupants, some of whom actually participated in the illegal acts, thus disclosing that petitioner never intended to discharge them. We think this is a non-sequitur. It is undisputed that petitioner at all times believed that more than fifty per cent of the occupants were compelled to participate in the seizure through coercion and intimidation, and it stated that applications for re-employment from such men would receive favorable consideration. The word re-employment would seem to indicate a former discharge and severance of relationship, at least it is not inconsistent with such indication. While several of the men who participated in the violence were also re-employed, yet, for the same reason we think that fact does not militate against the uncontradicted evidence that they were all discharged on February 17. It is also worthy of note that the fact that those re-employed were union men, or had been, would certainly support petitioner's contention that they were not discharged because of union membership, or lawful union activities.

■ It is further suggested by respondent, we suppose by way of mitigating circumstances, that the men were not engaged in sabotage, and that no malicious sabotage of equipment occurred. Both of these findings were made, and we think neither was supported by substantial evidence. Indeed, the contrary was supported by undisputed evidence. True, there was evidence to the effect that there was no major or serious injury to the machinery, but machinery is not the only item of a plant that may be the subject of sabotage, and it does not constitute the entire equipment of a plant. Malice may be either express or implied. It may be implied from acts themselves. Within the meaning of the law it includes not only hatred and revenge, but every other unlawful and unjustifiable act. It is not confined to ill-will towards an individual, but it is intended to denote an action flowing from any wicked and corrupt motive; a thing done with a wicked mind, and attended with such circumstances as plainly indicate a heart regardless of social duty and fully bent on

mischief. Here we have an admitted illegal seizure and retention of property, intentionally perpetrated; and intentional destruction of property with respect to the plant and portions of its equipment, supported by undisputed evidence. This we think conclusively shows a heart regardless of social duty and bent on mischief. But whether or not there was sabotage is not decisive of this case. Without it there still remained to petitioner a valid cause for discharge, which is supported by uncontradicted evidence, admitted by counsel in argument and not denied in the findings. Neither is it denied, but it is admitted, that petitioner told the men on February 17, that they were discharged, and we think this can not be brushed aside by a finding that petitioner did not intend to discharge them, based only on the fact that it afterwards re-employed some of them. This being true, the occupants of the building who were discharged on February 17, were no longer employees of petitioner, and none of them sustained that relationship again until they were re-employed. Hence there was no longer a majority of petitioner's employees who were members of that union, and the finding to the contrary is not supported by any evidence.

It is urged by the Board that the commission of a crime by strikers does not preclude their right to bargain with petitioner. This we admit, provided they still are employees and represent a majority of all. What we hold is that there was just cause for discharge, it was exercised, and those who have not been re-employed are not employees and were not at the time of the finding and order of the Board. The present employees still have their rights of bargaining without interference of the petitioner, and these may be enforced upon proper procedure. See National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Sands Mfg. Co., 96 F.2d 721, decided by the Circuit Court of Appeals for the Sixth Circuit, May 13, 1938; Standard Lime & Stone Co. v. National Labor Relations Board, 97 F.2d 531, decided by the Circuit Court of Appeals for the Fourth Circuit, June 13, 1938.

The order is set aside.

LINDLEY, District Judge (concurring).

The difference between my associates apparently grows out of the question of whether the employer for good cause terminated the relationship of employer and employee as to the trespassers who seized its property and otherwise violated the state law. That such seizure did occur is undisputed; that the act was "illegal" and "foolish" the respondent admitted; indeed, such characterization of the act is that of counsel for respondent. In fact, it has been finally adjudicated by the state courts upon appeal, after full hearing, that certain employees seized the plant, locked and barricaded it from the inside, employed fire extinguishing chemicals belonging to the employer to repel attempts of law enforcement officers to enforce judicial orders, bombarded the officers with sulphuric acid and pipes, bolts, nuts, and similar steel and iron articles. Many other acts of violence by the trespassers ensued, resulting in damage to and loss of property seized of the value of many thousands of dollars. "Illegal and foolish" are mild descriptive terms for the uncontradicted events.

Thereupon, directly and clearly, the petitioner discharged the wrongdoers solely because of their illegal acts. The evidence justifies no equivocation as to that conclusion. The discharge was justified and the employer was not thereafter under any obligation and sustained no relationship to the discharged men. They were no longer employees; consequently the Board's order being based erroneously (in part) upon a contrary premise, must be vacated. I do not think the law intends that an employer who has discharged acknowledged law violators can be compelled to reinstate them and in case of refusal be said to be, because of such action, a violator himself of the national law. I find nothing leading me to believe that Congress so intended.

In National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 46, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352, the court pointed out that the act does not interfere with normal exercise of the right of the employer to select its employees or discharge them, and then continued:

"The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is

exercised for other reasons than such intimidation and coercion."

When we remember that the discharge in the instant case was grounded solely upon the wilful illegal acts of certain employees, and not upon membership in the union, a fact that is fortified by the re-employment of certain of the trespassers who were members of the union, it is apparent that under the decision of the Supreme Court the Board may not treat it as unjustified. This conclusion is supported also by the language of the Supreme Court in Associated Press v. National Labor Relations Board, 301 U.S. 103, 132, 57 S.Ct. 650, 654, 81 L.Ed. 953, as follows:

"The act does not compel the petitioner to employ any one; it does not require that the petitioner retain in its employ an incompetent editor or one who fails faithfully to edit the news to reflect the facts without bias or prejudice. The act permits a discharge for any reason other than union activity or agitation for collective bargaining with employees. The restoration of Watson to his former position in no sense guarantees his continuance in petitioner's employ. The petitioner is at liberty, whenever occasion may arise, to exercise its undoubted right to sever his relationship for any cause that seems to it proper save only as a punishment for, or discouragement of, such activities as the act declares permissible."

See also Standard Lime & Stone Co. v. National Labor Relations Board, 4 Cir., 97 F.2d 531, June 13, 1938; Appalachian Elec. P. Co. v. National Labor Relations Board, 4 Cir., 93 F.2d 985.

TREANOR, Circuit Judge (dissenting).

My disagreement with the reasoning and result of the majority decision rests upon a difference of opinion as to the respective powers of the National Labor Relations Board and this court in the determination of the legal consequences to be attached to the unlawful acts of striking employees. It is, in short, my understanding of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., that when employees have ceased work in connection with a labor dispute or because of an unfair labor practice, the employer-employee relationship continues by force of law; and that although unlawful conduct by striking employees is a fact which must be considered by the Board in determining the scope of its order, such order cannot be set aside by this court unless the making of the order constitutes an abuse of discretion by the Board in view of all pertinent facts, including the fact of misconduct of the employees.

The National Labor Relations Act presupposes the existence of two basic facts: (1) A denial by employers of the right of employees to organize, and a refusal by the employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest; and (2) the necessary effect of the foregoing is to burden or obstruct commerce. It is the policy of the United States, as declared by the Act, to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate these obstructions when they have occurred by encouraging practices and procedure of collective bargaining, and by protecting the exercise by workers of full freedom of association, self organization, and decision of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection. The procedural mechanism created by the Act and the powers conferred upon the National Labor Relations Board are carefully chosen to make effective the foregoing policy. The Act declares that certain designated labor practices shall be "unfair labor practices" and empowers the Board to prevent, by means provided in the Act, any person from engaging in any unfair labor practice affecting commerce.

The Board is without power to attach any punitive consequences to unlawful conduct of employees occurring in connection with labor disputes or strikes. Indeed the legislative history of the Act discloses that such power was intentionally withheld from the Board; and that it was the congressional intention to leave unlawful conduct of employees of labor unions to be dealt with under the appropriate laws of the states and of the United States.[1] This one-

---

[1] "Nor can the committee sanction the suggestion that the bill should prohibit fraud or violence by employees or labor unions. The bill is not a mere police court measure. The remedies against such acts in the State and Federal courts and by the invocation of local police authorities are now adequate, as arrests and labor injunctions in industrial disputes throughout the country will attest.

sided feature has been criticized but the judicial answer was given by the United States Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp.[2]

While the Act does not purport to relieve striking employees from the legal consequences of unlawful acts committed in connection with a strike, Section 13, 29 U.S.C.A. § 163, provides that "nothing in this Act [chapter] shall be construed so as to interfere with or impede or diminish in any way the right to strike." The only conduct with which the Act purports to deal is the conduct of employers which comes within the legislative definition of unfair labor practices which are made unlawful by the Act itself; and which, apart from statutory regulation, are not unlawful.

But it is urged that the "sit-down" feature of the strike, plus the violence of the strikers when they resisted the efforts of officers to evict them from the petitioner's buildings, gave their employer sufficient cause to sever the employer-employee relationship, and that the employer did sever the relationship by discharging the strikers a few hours after the beginning of the strike. If the employer, in fact and in law, terminated the employer-employee relationship, it necessarily follows that that part of the order of the Board which required reinstatement was erroneous, since it is clear that the Board has power to reinstate only by ordering the employer to put back to work persons whose status, or relationship, of employee is preserved by the National Labor Relations Act. Respondent, National Labor Relations Board, insists that the purported discharge of the strikers was not in fact a discharge and was not so intended by the employer and not so understood by the striking employees. There is evidence which indicates that the action of the employer was intended merely to strengthen the bargaining position of the employer by weakening the force of the strike. The tenor of the negotiations with individual strikers after the strikers had been evicted from the plant buildings was consistent with the assumption that the employer still considered them to be striking employees. But granting that the petitioner intended to sever the employer-employee relationship, we are confronted with the plain language of the Act which, as a matter of law, continues the employer-employee relationship for purposes of the Act.[3] The reasonable construction is that one who is

* * * In addition, the procedure set up in this bill is not nearly so well suited as is existing law to the prevention of such fraud and violence. * * * The only result from introducing proposals of this sort into the bill, in the opinion, of the committee, would be to overwhelm the Board in every case with counter-charges and recriminations that would prevent it from doing the task that needs to be done." Sen.Rep. No. 573, 74th Cong. 1st Sess. (1935), pp. 16, 17. See also H.R. No. 1147, 74th Cong., 1st Sess. (1935), pp. 16, 17.

[2] 301 U.S. 1, 46, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352.

"The act has been criticized as one-sided in its application; that it subjects the employer to supervision and restraint and leaves untouched the abuses for which employees may be responsible; that it fails to provide a more comprehensive plan,—with better assurances of fairness to both sides and with increased chances of success in bringing about, if not compelling, equitable solutions of industrial disputes affecting interstate commerce. But we are dealing with the power of Congress, not with a particular policy or with the extent to which policy should go. We have frequently said that the legislative authority, exerted within its proper field, need not embrace all the evils within its reach. The Constitution does not forbid 'cautious advance, step by step,' in dealing with the evils which are exhibited in activities within the range of legislative power. Carroll v. Greenwich Insurance Co., 199 U.S. 401, 411, 26 S.Ct. 66, 50 L.Ed. 246; Keokee Consol. Coke Co. v. Taylor, 234 U.S. 224, 227, 34 S.Ct. 856, 58 L.Ed. 1288; Miller v. Wilson, 236 U.S. 373, 384, 35 S. Ct. 342, 59 L.Ed. 628, L.R.A.1915F, 829; Sproles v. Binford, 286 U.S. 374, 396, 52 S.Ct. 581, 76 L.Ed. 1167. The question in such cases is whether the Legislature, in what it does prescribe, has gone beyond constitutional limits."

[3] "Third. The strikers remained employees under section 2 (3) of the act, 29 U.S.C.A. § 152 (3), which provides: 'The term "employee" shall include * * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantial equivalent employment * * *.' Within this definition the strikers remained employees for the purpose of the act and were protected against the unfair labor practices denounced by it." National Labor Rela-

an employee at the inception of a labor dispute or unfair labor practice, and ceases work because of either, remains an employee as long as the labor dispute is "current" or as long as the unfair labor practice is cognizable by the Board as an obstruction to commerce. The obvious purpose of the Act is to continue the employee relationship as an instrumentality to be used by the Board as the basis of a reinstatement order, or other affirmative action and to avoid any factual controversy, such as in the instant case, respecting the continuance of the relationship.

In the instant case the striking employees were individuals whose work had ceased "in consequence of" and "in connection with" a current labor dispute, and the immediate cause of the cessation was the unfair labor practice of petitioner committed on February 17, 1937. Further, there was no contention that any of the individuals whose work had ceased had obtained "any other regular and substantially equivalent employment." The law of the National Labor Relations Act, applied to the facts of the instant case, required the Board, and requires this court, to recognize that the striking employees continued to have the status of employees for the purposes of the Act. And assuming that the misconduct of the striking employees was a material fact to be considered by the Board in making its decision, still no decision or order of the Board legally could have been predicated upon the assumption that the employer-employee relationship was terminated by the purported discharge of the men at a time when their work already had ceased as a consequence of, and in connection with, both a current labor dispute and an unfair labor practice by their employer.

There is substantial evidence to support a finding that the petitioner engaged in unfair labor practices in the following respects:

(1) Petitioner, prior to February 17, 1937, consistently interfered with, restrained and coerced its employees in their attempted exercise of rights guaranteed by the Act.

(2) On February 17, 1937, petitioner refused to bargain collectively with the Union, which at that time was the legal representative of the employees, who as an appropriate unit, were seeking to bargain with petitioner through its union as their agent.

(3) Subsequently petitioner refused at different times to bargain collectively with the Union as the representative of the striking employees.

(4) Petitioner "dominated and interfered" with the formation and administration of the R.M.W.A., a company union, which was organized subsequently to February 17, 1937.

The Board is empowered to prevent any person from engaging in any unfair labor practice affecting commerce[4] by issuing an order requiring the employer to cease and desist from any unfair labor practice. And on the basis of its findings, the Board clearly was empowered to issue the cease and desist order in question unless the conduct of the striking employees in some way paralyzed the power of the Board and rendered it impotent to carry out the expressed purpose and policy of the Act by taking the specific action which the statute empowers it to take. It is, therefore, necessary to consider the materiality of misconduct of employees to the exercise of its powers by the Board.

The power of the Board extends only to action to prevent unfair labor practices by employers and the Board has no power to control or punish conduct of employees either directly by imposing penalties or indirectly by relieving employers of the consequences of unfair labor practices. The conduct of employees prior to the commission of an alleged unfair labor practice is a material fact which the Board cannot ignore in determining whether the employer has engaged in unfair labor practices, but it is not available as a bar to the issuance of a cease and desist order when the evidence supports a finding that the employer has engaged in an unfair labor practice.

tions Board v. Mackay Radio & Tel. Co., 58 S.Ct. 904, 910, 82 L.Ed. —, Supreme Court of the United States, May 16, 1938.

4 29 U.S.C.A. § 160 (a): "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158) affecting commerce. This power shall be exclusive, and shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, code, law, or otherwise."

And in National Labor Relations Board v. Carlisle Lumber Company [5] the Ninth Circuit Court of Appeals held that enforcement of the National Labor Relations Board's cease and desist order would not be denied under the clean hands doctrine on the ground that picketing by the members of the Union, with which the employer had refused to bargain collectively as employees' agent, had resulted in violence and had violated state laws. The court disposed of the question in the following statement, page 146:

"Respondent contends that the proceeding before us is an equitable proceeding; that the union's picketing resulted in violence, as the Board found, which was a violation of the laws of Washington, and therefore enforcement should be denied for the reason that the union has not come into the court with clean hands. It is not the union, but the Board, which is asking enforcement."

And the Second Circuit Court of Appeals has held that an employer may not refuse to negotiate with a union because of its past misconduct if the union offers in good faith to negotiate as the representative of employees.[6] The following statement from the opinion is pertinent to the facts of this case:

"For this reason the conduct of a union, like that of an employer, not only during the negotiations when there are any, but before there are, may be relevant in ascertaining whether the proposal to confer is genuine, or only part of the tactics of the fight. Nothing else can be material; though the union may have misconducted itself, it has a locus pœnitentiæ; if it offers in good faith to treat, the employer may not refuse because of its past sins. In the case at bar there was no warrant whatever for supposing that further negotiations would have been useless."

In the instant case no misconduct of members of the union either as employees of petitioner or as representatives of the bargaining unit occurred prior to the unfair labor practices in which the petitioner had engaged prior to and including February 17, 1937, and which culminated in the bald refusal on February 17, 1937, to bargain collectively. Consequently, the misconduct could not affect the validity of the Board's order insofar as it required the petitioner

to cease and desist from those unfair labor practices. And if I am correct in believing that the strikers continued to be employees for the purpose of the exercise by the Board of its powers under the Act, the misconduct could not have vitiated the power of the Board to attempt to remedy, by a cease and desist order, the effects of the unfair labor practices engaged in subsequently to February 17, 1937, since the evidence discloses that the striking employees were continuously willing to enter into good faith negotiations with the petitioner. National Labor Relations Board v. Remington Rand, Inc., supra; National Labor Relations Board v. Carlisle Lumber Co., supra.

In respect to the reinstatement provision of the Board's order the petitioner makes the point that the Board is authorized to take only such affirmative action as will effectuate the policies of the Act; and urges that the reinstatement of the individuals who participated in unlawful acts would militate against, rather than effectuate, the policies of the Act. In my opinion petitioner is right in its contention that the authority of the Board in respect to affirmative action is limited to such action as will effectuate the policies of the Act. Consequently, it does not follow that the Board must reinstate all, or any employees, even though it properly finds that the employer has engaged in unfair labor practices and must, therefore, issue a cease and desist order. This is clear from the language of the pertinent section which definitely fixes the content of the cease and desist order but leaves the content of the order, requiring affirmative action by the employer, in the discretion of the Board subject only to the qualification that it effectuate the policies of the Act.

It was held in National Labor Relations Board v. Mackay Radio & Telegraph Co., supra, that the Board properly ordered reinstatement of employees who were refused reinstatement by the employer solely because of their union activities. But the unfair labor practice complained of in that case was the alleged discrimination in reinstating employees. Obviously such order of reinstatement effectuated the policy of preventing that particular type of unfair labor practice. On the other hand the Mackay opinion states that an employer who has not been engaged in any unfair

---

[5] 94 F.2d 138, 146.
[6] National Labor Relations Board v. Remington Rand, Inc., 94 F.2d 862, 872, 873.

labor practice has not lost the right to protect and continue his business by supplying places left vacant by strikers; and that the employer is not engaging in an unfair labor practice either when, in order to obtain employees to fill strikers' places, he assures them of permanent employment or when he reinstates only enough to fill vacant places. But the foregoing observations were applied to a case in which the employees had gone on a strike in connection with a labor dispute and had abandoned their strike before any unfair labor practice had been committed by the employer. The only unfair labor practice charged was the discriminatory refusal to reinstate five men. And the Supreme Court upheld the Board's order requiring the reinstatement of the five men. In the instant case before the strike and during the pendency of a labor dispute the employer had engaged in unfair labor practices of the type which, if persisted in, would completely nullify the policies of the Act. The positive refusal on February 17, 1937, to recognize and bargain with the union, which was the lawful bargaining agent of the employees, precipitated the strike. It is the position of the Board that the status quo must be restored as of the time of the unfair labor practice of February 17, 1937, in order to effectuate the policies of the Act; and that this necessitates the reinstatement of all the members of the appropriate bargaining unit and the recognition of the union as the bargaining agent for the unit. The general principle seems sound under the Act and is amply supported by the reasoning and decisions in National Labor Relations Board v. Remington Rand, Inc., supra, and Black Diamond S. S. Corporation v. National Labor Relations Board.[7] In the latter case various groups of employees had ceased work in connection with labor disputes before any unfair labor practices had occurred. Later there was a refusal, on December 14, 1937, to bargain collectively with the lawful agents of appropriate units. The following statements by the Second Circuit Court of Appeals in its opinion in the Black Diamond Case are of special significance in determining the validity of the reinstatement feature of the Board's order in the instant case:

"The act so far as reinstatement is concerned only applies after there has been an unfair labor practice. As we have said in the opinion in National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, to be filed herewith: 'the powers granted the Board under section 10(c), 29 U.S.C.A. § 160(c), are only remedial; they are designed to enable it to restore the status quo as nearly as possible, had the wrong not been committed; further it may not go.'

\*　　\*　　\*　　\*　　\*　　\*

"Under the act men who cease working because of a labor dispute or because of an unfair labor practice retain the status of employees. How long this continues is not made clear. But it is not necessary to decide the point here. All engineers were employees under the act, who had left work in consequence of labor disputes. But, having done so before any unfair labor practice, they were relying, and were only entitled to rely, upon a test of economic strength. They struck at a time when the Board was conducting an election. Since the act expressly leaves the right to strike unaffected, any remedies they had were unaffected by continuing on strike. When, on December 14, 1936, the Black Diamond refused to bargain with the certified bargaining agent of its employees, it violated the act and became subject to such orders of the Board 'as will effectuate the policies of this Act (chapter).' Section 10(c), 29 U.S.C.A. § 160(c).

"From the date of the respondent's first unfair practice, its ordinary right to select its employees became vulnerable. Accordingly it was proper for the Board to order it to discharge all engineers hired for the first time since December 14, 1936, and to offer reinstatement first to those striking engineers whose former positions were open, and then to the other striking engineers if, for any reason, any man entitled to reinstatement refused to accept it. To those men so reinstated the company must also give back pay. This is the extent of the order.

"\*　\*　\* They say that in the Supreme Court's recent decisions sustaining the Wagner Act, 29 U.S.C.A. §§ 151–166, the persons reinstated had been discharged because of union membership or activities, whereas here the severance of relations was voluntary. But under section 2(3) of the act, 29 U.S.C.A. § 152(3), the striking engineers still remained employees, and to 'effectuate the policies of this act (chapter),' section 10(c), 29 U.S.C.A. § 160(c),

7 2 Cir., 94 F.2d 875, 879.

388

no more is done than to maintain the status quo which existed on December 14, 1936, as against unfair labor practices which occurred thereafter. The facts bring the case within the rule established in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and the other Supreme Court decisions."

On the authority of the decisions of the Supreme Court of the United States in which the National Labor Relations Act has been construed and applied, and more particularly on the authority of the Supreme Court decision in the Mackay Case, supra, and the decisions of the Second Circuit Court of Appeals in the Remington Rand and Black Diamond Cases, supra, and the Ninth Circuit Court of Appeals in the Carlisle Case, supra, I am of the opinion that the order of the Board in the instant case is in general valid.

I believe, however, that petitioner's contention that the reinstatement feature is too broad, even under the decision in the Black Diamond Case, is well taken, unless the present reinstatement provision can be construed to limit the requirement of reinstatement to those for whom jobs would be available upon dismissal of all new employees who were hired after the refusal to bargain on February 17, 1937. Although management policies and practices which affect the positions of employees may be the basis of legitimate labor disputes in respect to which the employees may assert their right to collective bargaining under the National Labor Relations Act, yet there is no provision in the Act which purports to qualify the right of an employer to abolish unnecessary jobs either during the pendency of a labor dispute or after the commission of an unfair labor practice by an employer. In short, the National Labor Relations Act continues the employer-employee relationship for the purpose of enabling the Board to effectively prevent unfair labor practices, but does not protect striking employees from disadvantages which result from normal management action taken by the employer during the time the striking employees voluntarily refuse to work.

As indicated above, I believe that it is the duty of the Board, in determining the scope of a reinstatement order, to take into consideration unlawful conduct of striking employees when such conduct will militate against the effectuation of the policies of the Act in case of restoration of striking employees to their work. It is not within the lawful authority of the Board to order reinstatement, or refuse to order it, as a punitive measure either against employees for unlawful acts or against employers for engaging in unfair labor practices. Obviously, the threat of continued unlawful acts by striking employees should not be considered a factor favoring reinstatement; on the other hand neither should the possibility of friction between employer and reinstated employees resulting from the employer's resentment of reinstatement as a means of effectuating the policies of the Act be considered a factor favoring refusal of reinstatement. It seems that the dominating consideration should be the probable effect upon the future relations between the employer and the employees in respect to the problem of avoiding, or peaceably settling industrial disputes. If, in the instant case, employees had continued their unlawful acts in disregard of the rights of petitioner, and if there had been reasonable ground for the Board to conclude that because of the continuing effect of employees' misconduct, a general reinstatement would demoralize the operation of petitioner's business and would encourage rather than discourage interruptions of production with consequent interference with commerce, then the Board should have denied a general reinstatement. This should have been done, however, not under the unrelated equity doctrine of clean hands, but because a general reinstatement reasonably could not contribute to the effectuation of the policies of the Act.

In view of the evidence which was before the Board, I do not believe that this court can hold that the Board acted arbitrarily in concluding that the return of the striking employees under a general reinstatement order would contribute substantially to the effectuation of the policies of the National Labor Relations Act.

After the eviction of the striking employees from the plant buildings there were no unlawful acts committed by the employees and no unlawful efforts to interfere with the operation of the plant. The request for union recognition and collective bargaining was repeated and was refused. Petitioner's superintendent had authority to restaff the plant with new employees in addition to such of the old employees as he should see fit to reinstate. Thirty-five of the sit-down strikers were reinstated and

many of them testified at the hearing that they had been active in resisting the officers who were seeking to evict them from the petitioner's buildings. Four strikers who testified at the hearing that they had engaged in violence, and detailed acts of violence committed by themselves, were returned to work; and these men, along with other sit-down strikers who were working for petitioner at the time of the hearing, were paid full wages for the time which was lost by reason of the sit-down strike. One striking employee testified that in a conversation with petitioner's superintendent he was told that he would be called when he was needed; that the superintendent made no objections to his return to employment because of his participation in the sit-down strike. He also testified that the superintendent shook hands with him and said "all is forgiven." There is testimony which indicates that other sit-down strikers could have returned to their jobs if they had been willing to return without union recognition and general reinstatement of the strikers.

In view of the foregoing and other evidence which is in the record it was not unreasonable for the Board to conclude that a general reinstatement of the striking employees would not result in friction between employer and employees merely because of the presence and activities of the reinstated employees. And, assuming full recognition by the petitioner of the policy of collective bargaining as provided for in the Act, the Board was justified in concluding that future peaceable settlement of labor disputes would be facilitated rather than obstructed.

It is urged that an affirmance of the order of the Board is an approval of the unlawful acts of the employees. I understand the emotional appeal involved in that contention, but cannot comprehend its relation to a judicial consideration of the question before us. It is as meaningless as would be the contention that a reversal of the order of the Board constitutes an approval of the unlawful defiance of the National Labor Relations Act by the petitioner. Granting that the employees were wrong in assuming that they could rightfully strengthen the force of their strike by remaining in possession of the building in which they worked, it is obvious that they did not make a greater mistake as to the law than did the petitioner and its advisers who believed that the petitioner could rightfully refuse to bargain collectively with the agent of the employees on the ground that the National Labor Relations Act was unconstitutional. The striking employees paid the penalty for their resistance of the officers of the law who were acting under order of the state court,—at least all did against whom proceedings were not dropped. The National Labor Relations Board had no jurisdiction over that question. It does have jurisdiction over the case presented by the unfair labor practices of the petitioner; and the question for decision by this court is whether the order of the Board made in the performance of its duties under the National Labor Relations Act was within its statutory power to make on the basis of the findings which were supported by substantial evidence. With the exception above noted, I think it was.