**NATIONAL LABOR RELATIONS BOARD
v. SANDS MFG. CO.
No. 7767.**

Circuit Court of Appeals, Sixth Circuit.
May 13, 1938.

Laurence A. Knapp, of Washington, D. C. (Charles Fahy, Robert B. Watts, Thomas I. Emerson, Laurence A. Knapp, and Joseph Rosenfarb, all of Washington, D. C., on the brief), for petitioner.

H. E. Smoyer, of Cleveland, Ohio (Stanley & Smoyer, of Cleveland, Ohio, on the brief), for respondent.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

This case arises out of a petition by the National Labor Relations Board to enforce its order, and a cross-petition by respondent, praying for review of such order. The Board issued a complaint against respondent at the instance of the Mechanics Educational Society of America, a labor organization (hereinafter called the MESA), alleging that respondent had violated section 2, subdivisions (6) and (7) and section 8, subdivisions (1), (3) and (5) of the National Labor Relations Act, title 29, §§ 151 et seq., U.S.C., 29 U.S.C.A. § 151 et seq. and sections 152(6, 7), 158(1, 3, 5).

A hearing was held before the trial examiner, who decided that respondent had locked out, discharged, and refused to employ some forty-eight of its employees, and had interfered with, restrained and coerced its employees in the exercise of their rights to organize and bargain collectively, had discouraged membership in the MESA, and had thus engaged in unfair labor practices within the meaning of the statute. Because of his opinion that much of the difficulty might have been avoided by the employees themselves, the examiner recommended their reinstatement without back pay. The Board approved the examiner's findings, and decided in addition that respondent had refused to bargain collectively with MESA as the exclusive representative of its employees, in violation of subsection (5) of section 158, title 29, U.S.C., 29 U.S.C.A. § 158(5), and ordered reinstatement of the employees with back pay from September 3, 1935, to the date of offer of reinstatement.

Respondent manufactures heaters, valves and parts. The plant is small, the number of employees varying roughly from 30 to 85, according to the volume of orders. It is subdivided into departments, such as the machine shop, coil, tank, heater, and assembly departments, in which the work performed varies in its nature. In the machine shop raw material and certain parts are machined and fabricated, and the stock is prepared which is assembled and processed in the other departments.

Early in 1934 practically all of the employees joined the MESA, and designated three of their number as a committee to represent them for purposes of collective bargaining. No question is raised as to the committee's authority. Respondent immediately recognized and conferred with the shop committee whenever requested to do so. The parties operated under a mutual agreement for increase in wages from May 2, 1934, until May, 1935. In the fall of 1934 the MESA agreed that respondent could hire additional workmen to fill a projected Government order, on condition that it discharge such additional men when the order had been completed. This promise was carried out by the management. Practically all of the men newly hired became members of the MESA, and respondent in no way opposed this membership. In May, 1935, the shop committee asked for a wage increase, and when this was denied, called a strike on May 21, 1935. Negotiations continued during the strike, and an oral agreement was entered into under which the strikers returned to work on June 3, 1935, but struck again on June 6th, because respondent had refused to reinstate seven of the strikers. Respondent claimed that these men were inefficient, and Potter, representative of the MESA, said that several of them might be incompetent.

Further negotiations were held, and the contract of June 15, 1935, resulted. It was drafted by the shop committee of the MESA, certain changes being made at the insistence of respondent. The contract provided for an increase of wages, for the discharge of certain employees objected to by the shop committee, and otherwise regulated the conditions of employment. The employees, including the seven whom respondent wished to discharge, then returned to work.

By the middle of July respondent had filled the orders accumulated during the strikes, and after conference, the men in its tank heater department, with the exception of the foreman, were laid off, and the plant was operated on a schedule of three days a week. Respondent wished to increase the force in the machine shop in order to prepare stock, and to employ for that purpose new men experienced in machine shop work, instead of transferring old men from other departments, claiming that the contract of June 15th entitled it to this method of operation. At this time a number of the machine shop employees were members of the International Association of Machinists affiliated with the American Federation of Labor. The shop committee contended that under the contract no new men could be hired for the machine shop so long as old men in other departments of the plant were not employed.

Additional conferences were held on the subject, in which the views of the employer and the employees were diametrically opposed, both as to the meaning of the contract, and as to whether respondent should hire new men for the machine shop. The discussions were held at frequent intervals until August 19, 1935, when the shop committee was asked by the management to consult with the men and report whether they desired that the working force in the machine shop should be increased by new men while other departments were temporarily shut down, or that the whole plant should be temporarily shut down. The committee stated that it preferred that the plant be shut down. Respondent closed its factory on August 21st. Shortly thereafter it negotiated an agreement with the International Association of Machinists, and sought experienced machinists through the Cuyahoga County relief organization. On September 3d the respondent opened its machine shop, invited a number of its former machine shop employees all members of the International Association of Machinists to return to work, but filled other places in the machine shop with new men instead of calling old men from other departments of the plant. Forty-eight men, all members of the MESA were not recalled. Respondent offered individual contracts to four of the old MESA men whom it wished to employ as foremen. To two of them the offer was made upon the condition that they join the International Association of Machinists.

Upon these facts the Board found that the respondent had refused to bargain collectively with the representative of its old employees; that the old employees were locked out, discharged and refused employment because they were members of the MESA; that by failing to recall its employees who were members of the MESA and by requiring that certain of them join the International Association of Machinists as a condition of employment, respondent discriminated against its employees in regard to tenure of employment and thereby discouraged membership in the MESA, and

that by all of these acts 'respondent interfered with, restrained and coerced its employees in the exercise of the rights guaranteed under the statute.

■ The findings of the Board as to the facts, if supported by evidence, are conclusive. The court may not, by substituting its own conclusions, reverse the Board's findings unless the evidence affords no reasonable basis for them. Agwilines, Inc., v. National Labor Relations Board, 5 Cir., 87 F.2d 146, 151. The contention here is that the Board refused to make certain findings supported by the evidence, and that its conclusions either are based on no evidence, or are contrary to the Board's own findings of fact. The facts for the most part are not in dispute, and the principal question is whether the Board's findings, taken together with the admitted facts, compel a different conclusion.

### Refusal to Bargain Collectively

■ The Board found that respondent had refused to bargain collectively with the representatives of its old employees.[1] This finding is based on the fact that Potter, state chairman of the MESA, and a former employee of respondent, on September 4th, over the telephone, asked for a meeting with respondent, which the management refused. The shop committee (the MESA committee of the plant) never communicated with respondent after this time, but picketed the plant immediately. The finding is also based upon respondent's negotiations with the other union affiliated with the American Federation of Labor and the replacement of members of the MESA with new men and offer of individual contracts to four of the old employees after the layoff of August 21st. The last element in this finding may be briefly dealt with. The National Labor Relations Act does not prevent the employer from hiring individuals on whatever terms he may by unilateral action determine (National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352), and the offer of individual contracts to the four old employees was not illegal.

■ The legal effect of the refusal to meet with Potter, of the replacement of the old men with new men, and of the negotiations with a different union, depends upon whether the MESA and the employees had violated their contract prior to August 21st, thereby entitling respondent to abrogate the contract so that the old men were no longer its employees. The Board stated that although it believed that an honest difference of opinion existed on the construction of the contract, it did not alter the case if the shop committee was considered to have violated the agreement. We disagree with this view. While the statute creates new and important rights for labor, it does not abrogate the correlative rights of the employer. As stated in National Labor Relations Board v. Jones & Laughlin Steel Corporation, supra, 301 U.S. 1, at page 45, 57 S.Ct. 615, 628, 81 L. Ed. 893, 108 A.L.R. 1352:

"The act does not compel agreements between employers and employees. It does not compel any agreement whatever. It does not prevent the employer 'from refusing to make a collective contract and hiring individuals on whatever terms' the employer 'may by unilateral action determine.' The act expressly provides in section 9(a) [29 U.S.C.A. § 159(a)] that any individual employee or a group of employees shall have the right at any time to present grievances to their employer. The theory of the act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the act in itself does not attempt to compel. The act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion. The true purpose is the subject of investigation

[1] The terms "old men" and "new men" are used in this opinion in the same sense as defined in the contract of June 15, 1935, which is as follows: "That the old employees are to be all men in the employ of the company at the time the original agreement was signed and prior to the government order. That the new men, as stated above, be considered as the second section of employees and men who were employed at the time of the government order during the fall of 1934."

with full opportunity to show the facts. It would seem that when employers freely recognize the right of their employees to their own organizations and their unrestricted right of representation there will be much less occasion for controversy in respect to the free and appropriate exercise of the right of selection and discharge."

## The Contract

Paragraphs (5), (6) and (7) of the contract, which are the portions in controversy, read as follows:

"(5). That when employees are laid off, seniority rights shall rule, and by departments.

"(6). That when one department is shut down, men from this department will not be transferred or work in other departments until all old men only within that department, who were laid off, have been called back.

"(7). That all new employees be laid off before any old employees, in order to guarantee if possible at least one week's full time before the working week is reduced to three days."

■ It had been respondent's practice when work was slack to transfer men from their regular departments to other departments. Respondent considered this practice inefficient, and therefore, when the contract was being negotiated, it insisted that the words "and by departments," at the end of paragraph (5), be inserted. The express purpose was that respondent might discontinue the practice of calling old men back except to their own departments, and members of the shop committee testified in effect that it was intended to enable respondent to "run by departments." The Board considered that paragraph (5) is at variance with paragraph (7), which deals with the same subject but is not limited to departments. It therefore decided that the shop committee was not unreasonable in contending that the preference to old men over new men applied to the whole plant, and not to departments only. We do not so construe paragraph (7). While it relates in a limited way to seniority rights, it has no bearing upon the question as to whether those rights in general shall govern through the plant as a whole, or by departments. Respondent's contention is strengthened by the addition of the word "only," which was inserted at its instance in paragraph (6). We see no ambiguity in the contract, and agree with respondent's construction of it. To give it any other meaning is to nullify paragraph (5). The men objected to carrying out this provision, and the matter was discussed repeatedly from the time of the execution of the agreement. Respondent is not charged with breaking the contract, and in fact this record shows that it complied on its part with all terms of the agreement, but the shop committee refused to permit respondent to increase the force in the machine shop in accordance with the contract, even though the only alternative was the closing of the plant.

The Board gave weight to the fact that respondent, after the words "and by departments" were inserted in paragraph 5, and after the contract was executed, occasionally transferred certain old men from their regular departments to others. It is plain, however, that this was done because of the insistence of the men and because of the constant fear of strikes. Shortly after the execution of the contract respondent posted in its plant a classification of its employees by departments, and thus gave notice of its intention and desire to proceed under the contract.

■ Respondent was not bound for an indefinite time to negotiate with an organization which had broken its contract, nor to negotiate in order to secure its performance. The statute does not compel the employer to renounce reliance upon its rights under a valid agreement. It merely requires the employer to negotiate sincerely. Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 139, 112 A.L.R. 948. The sincerity of the employer's effort is to be tested by the length of time involved in the negotiations, their frequency, and the persistence with which the employer offers opportunity for agreement. The evidence is overwhelming here to the effect that such negotiations had actually taken place. Potter says that respondent's manager sent word when the MESA entered the plant that the men had the privilege of belonging to any union they wished, and that there was no objection on his part to any organization. He states in effect that the shop committee never had any trouble getting meetings, and that the manager did not object to his presence as a union representative in the consultations during the strike in 1935. Repeated conferences were held from May to August 21, 1935, in an endeavor to arrive at an agreement on the meaning of the contract.

Although the Board finds this as a fact, and that an "honest difference of opinion" as to the contract existed, and that the parties were "diametrically opposed," on the matter of the application of seniority preference by departments as opposed to its application throughout the plant as a whole, the Board ignores the conclusion from these facts and gives over-emphasis to the events which occurred after August 21, 1935. There was no refusal by respondent to bargain collectively until after two months of continuous effort on its part to secure performance of the contract. In view of the background, the uncontroverted facts as to the complete lack of any attempt to prevent organization or to discourage affiliation with the MESA, the want of espionage or coercion practiced on the part of the management, and the express findings of the Board as to repeated conferences, honest difference of opinion, and diametrical opposition of views, we think that only one conclusion can be drawn, namely, that the respondent sincerely attempted over a long period to negotiate with the MESA. When the men would not perform their contract an impasse arose. Respondent was not obligated to prolong the impasse, and its refusal to bargain further did not constitute a violation of the statute.

### Discrimination in Tenure

The Board found that the respondent discriminated in regard to tenure of employment, and thereby discouraged membership in the MESA, in violation of title 29, section 158(3), 29 U.S C.A. § 158(3), in that it failed to recall its employees who were members of the MESA, and required that certain of them join the International Association of Machinists as a condition of employment.

█ The statute does not interfere with the normal right of the employer to select or discharge his employees. National Labor Relations Board v. Jones & Laughlin Steel Corporation, supra, 301 U.S. 1, at page 45, 57 S.Ct. 615, 628, 81 L.Ed. 893, 108 A.L.R. 1352. If employees violate their contract, they may be discharged for that reason, and this does not constitute a discrimination in regard to tenure of employment nor an unfair labor practice, nor does it constitute discharge because the employees are members of a union. In this case no evidence appears that the employees were discharged because of their membership in the MESA or any union. The re-

spondent was not compelled to put before the men, singly or collectively, any new propositions after the shop committee had chosen the lay-off, which in effect was equivalent to a strike. Section 152(3), title 29, U.S.C., 29 U.S.C.A. § 152(3), provides that "The term 'employee' shall include any employee * * * whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice * * *" The controversy over seniority rights was a current labor dispute within the definition of title 29, section 152(9), 29 U.S.C.A. § 152(9). But the statute does not provide that the relationship held in statu quo under title 29, section 152(3), 29 U.S.C.A. § 152(3), shall continue in absence of wrongful conduct on the part of the employer and of rightful conduct on the part of the employees. If such were its meaning, the right of the employer to select and discharge his employees (National Labor Relations Board v. Jones & Laughlin Steel Corporation, supra), which still exists in absence of intimidation or coercion in violation of the statute, would be cut off. As the respondent was within its rights in not recalling the old men, their relationship was terminated by the discharge, and no discrimination in tenure existed.

### Negotiation with Another Union

█ So long as the employee relationship continued, and there was any possibility that the old men and the MESA would perform the contract, which on August 21st had six months to run, there is no substantial evidence of conflict between the management and the organization. When the machine shop was reopened on September 3, 1935, members of the MESA were not in the majority, and that organization was no longer representative of the employees. Respondent turned to another organization as a source of labor supply. The fact that respondent did not call back any of the MESA members was therefore not a discrimination in tenure. The discharge was rightful, and the order of reinstatement must be set aside.

█ In view of the fact that the conclusions of the Board were contradicted by and at variance with so many of its evidential findings, we deem it necessary to reemphasize the obligation which rests upon the Board as a quasi-judicial tribunal. The very fact that in the initial stages of

the proceeding the Board files the complaint, hears the complaint through its examiner, and then makes a decision based thereon, requires it with scrupulous impartiality to evaluate the evidence presented on behalf not only of the employees, but also on behalf of the employer. Cf. Morgan v. United States, 58 S.Ct. 773, 82 L.Ed. ——, decided April 25, 1938.

### Coercion of Employees

The respondent suggested during September to two of its old employees that they join the American Federation of Labor as a condition of employment. Since the contract had already been abrogated and the men had been discharged, and since the MESA was no longer the exclusive representative of the employees, these acts have no relation to the controversy here.

The order is set aside, and the petition to enforce is dismissed.