## NATIONAL LABOR RELATIONS BOARD v. HART COTTON MILLS, Inc.

No. 6262.

United States Court of Appeals
Fourth Circuit.

Argued June 11, 1951.

Decided July 31, 1951.

Elizabeth W. Weston, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Owsley Vose, Atty., National Labor Relations

Board, Washington, D. C., on the brief), for petitioner.

Whiteford S. Blakeney, Charlotte, N. C. (Henry C. Bourne, Tarboro, N. C., and Pierce & Blakeney, Charlotte, N. C., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

In this case the National Labor Relations Board seeks to enforce its order against the Hart Cotton Mills Inc., a North Carolina corporation, directing it to bargain collectively with the Textile Workers Union of America, C.I.O., and to reinstate striking employees to the same or equivalent jobs on the shifts formerly held by them and to make whole each of the employees for any loss of pay suffered by reason of the Company's discrimination against him, on and after December 5, 1949. The order is based on findings of the Trial Examiner, which the Board adopted as its own, to the effect that in violation of Section 8(a)(5) of the Labor Management Relations Act, 29 U.S.C.A. 158(a)(5), the Company refused to bargain in good faith with the Union, both before and after May 12, 1949, when the employees went on strike; and that in violation of Section 8 (a)(1) of the Act the Company interfered with normal bargaining processes by threatening striking employees with loss of employment and eviction from the Company's houses, and by promising them benefits if they return to work.

The Union was certified in October, 1945, and entered into a contract with the Company for the period of one year on May 11, 1946. In May, 1947 and May, 1948, subsequent yearly contracts were negotiated, the latter being automatically renewable on May 12, 1949, unless terminated by 60 days' notice. On March 1, 1949, the Union gave notice that it desired to modify the contract and in case of disagreement, to terminate the contract on May 12, 1949; and on March 24, 1949, the Company concurred that a change in the existing agreement was necessary and consented to a conference with the Union on March 31. Thereafter fifteen bargaining conferences were held of which eight took place before the strike, namely: on March 31, April 15, April 19, April 27, April 28, May 4, May 11 and May 12; and seven were held during the strike, namely, on June 2, June 14, June 27, August 2, September 22, October 6 and October 19. On May 12, 1949, the termination date of the 1948 contract, the employees went on strike which continued until November 27, 1949, when it was called off by the Union, and since that date all strikers who desired to return to their jobs have been reinstated by the Company save three who had been convicted for felonious assault during the strike.[1]

The adverse decision of the Trial Examiner is based upon his ultimate conclusion that the Company "did not intend to reach an agreement with the Union and maneuvered throughout the negotiations to prevent the reaching of an agreement"; or in other words, that from the beginning the Company's actions were not taken in good faith. It becomes necessary, therefore, to examine in some detail the subject matter of the old contract, the negotiations between the parties and the analysis of the evidence in the Examiner's report; and it is particularly important to scrutinize the conduct of the parties during the peaceful period before the strike occurred and before the situation had degenerated into industrial warfare marked by physical violations and lawlessness, civil and criminal prosecutions, and the emotional tensions which inevitably accompanied the conflict.

The previous contract which furnished the basis of negotiation dealt with a wide range of topics including definition of the bargaining unit, management, discharge, adjustment of grievances, arbitration, work assignments, wages, wage adjustments, hours, holidays, vacations, leaves of absence, seniority, strikes and lockouts, shop rules, safety and health, voluntary dues deduction, and duration and renewal.

---

1. A limited number of strikers were not returned to positions on the same shift on which they were employed at the time of the strike.

On March 31, 1949, the Union presented the Company with a proposed contract embodying thirteen changes, and it was discussed by the parties paragraph by paragraph to show how it varied from the contract of May 12, 1948. Six of the changes were of substantial importance and proposed a Company financed health and accident insurance for the workers; a freeze of the existing scale of wages for six months; an increase in the overtime payment for work on six named holidays; an extension of the Company's vacation plan; an increase in the fatigue time allowance for the workers; and a withdrawal of the employees' right to cancel at any time their voluntary check-off authorizations.

At this conference Marcus W. Carter, the general manager of the Company, who was authorized to act for it in reaching an agreement with the Union, announced that the Company could not afford to increase its costs, and also that the Company would not continue to give a second week of vacation with pay, since it had been determined by arbitration under the old contract that the money must be paid at the end of the vacation whereas the Company was of the opinion that, because it was conditioned upon 80 per cent. attendance during the year, it should not be paid until the end of the contract year.

Three conferences following the first meeting were held on April 15, April 19 and April 27, but no agreement was reached. On April 15 and April 27, the Company presented proposals in writing which, as summarized by the Examiner, are set out in the footnote.[2] The proposals of April 15, related to guarantees of rates

2. "On April 15, 1949, the parties met again. On this occasion the Respondent presented its first proposal in writing. In this the Respondent demanded a change in the definition of the unit; the elimination of all guarantees to pieceworkers on changes of work assignments beyond the fact that the wage rate on the new assignment would not be set below 'a fair rate of pay'; the reduction in fatigue time allowance for all workers and its elimination for fixers; the elimination of all sections, except that granting a 5-cent per hour premium for work performed on the third shift, of Section 8 of the 1949 contract dealing with overtime rates, reporting time, and holiday overtime pay; the elimination of all vacation payments, both first and second week; the inclusion of a new clause giving the Respondent the unilateral right to discharge any employees unable to furnish proof or assurance of physical ability to work steadily; a clause creating union liability for strikes and the elimination of the check-off.

\* \* \* \* \* \*

Following these futile negotiations the parties met again on April 27 when the Respondent produced another written proposed agreement. This proposal contains the following changes from the proposal of April 15:

1. Reverted to the old definition contained in the 1948 contract of the appropriate unit;

2. Guaranteed the group average earnings of pieceworkers the "base rate" of their prior job for a period of 4 weeks after a change in their work assignment with a number of qualifications;

3. Eliminate all fatigue allowance for all workers;

4. Reinstated all of Section 8 of the 1948 contract regarding reporting pay and overtime pay but still provided only regular pay for holidays;

5. Granted 1 week vacation pay to workers employed for 1 year but eliminated the second week for those employed 5 years or more. (This last was the issue determined adversely to the Respondent's contention in the arbitration award of March 1949);

6. Granted to the Respondent the unilateral right to discharge an employee and, in addition, required the employee to take a physical examination before a doctor of the Respondent's choice;

7. Reverted to the 1948 contract on the no-strike clause thus limiting the Union's liability for strikes;

8. Reverted to the 1948 contract clause on the check-off thus permitting the voluntary check-off as had been customary in all prior contracts between the parties.

In addition to these changes in position, some of which were complete reversals and some mere modifications of the Respondent's position as of April 15, the Respondent's new proposals added the following new demands:

1. Eliminated the clause guaranteeing employees freedom from discharge except for 'just cause' and the right to grieve for the abuse thereof;

2. Created a 60-day probationary period for all new employees."

of pay to pieceworkers on changes of work assignments, reduction in fatigue time allowance, elimination of sections of the contract dealing with overtime rates, vacation payments, unilateral right of discharge of physically disabled employees, union liability for strikes, and the elimination of the check-off. Changes were made in this list by the written proposal of April 27, as will appear from the complete summary below.

The evidence shows the proposals of the Company and those of the Union were the subject of continuous discussion at these April meetings but without definite result. The same is true of the subsequent conference on May 4. Matters were then moving to a crisis since the existing contract expired at midnight May 12. Consequently the parties met again on May 11. Thereupon the Company made additional demands which included the elimination of a 5¢ per hour premium payment to all workers on the third shift, the deletion of two of the six named holidays, which would have enabled the Company to operate at regular time instead of time and a half on these two days, and elimination of the check-off. At the request of the Union the conference was then adjourned until three o'clock the next day. At this meeting on May 12 a number of minor issues were compromised or agreed upon or dropped by the Union. The Company representative announced that it would grant the check-off if the Company could secure the conditions it desired, that is to say, the reduction of the piece workers' guarantee of individual earnings on change of work assignment, the elimination of certain holiday overtime pay, the eliminaton of the second week's vacation pay, and the unilateral right of the Company to eliminate the third shift premium pay. Because of this announcement the check-off was not considered in subsequent discussions. Although the parties met almost continuously during the afternoon and evening, no final agreement could be reached; and upon the report of the Union representatives to meetings of the workers that night, the strike was called. The evidence with regard to the three additional proposals made by the Company on May 11 shows that the Company was prepared to abandon the elimination of the check-off, and that its reason for the addition of the other two issues at this date was the fact that the Company had learned that an existing contract between an employer and the Union at another competing textile mill did not require the payment of a premium for work on the third shift or the payment of time and a half for work performed on the two holidays which the Company proposed to eliminate.

It thus appears that on May 12, at the conclusion of the lengthy conferences and discussions above described, there were five live issues on which there was disagreement of the parties as follows:

First: *The piece-rate workers' guarantee.* The 1948 contract contained a guarantee to piece-rate workers of their individual earnings for a four week period following a change in work assignment. The Company reasoned that the guarantee of individual earnings encouraged employees to "lay down" upon change of work assignment and sought to guarantee earnings either on a group average or a base rate.

Second: *Vacation pay.* An arbitrator's decision under the 1948 contract held that the second week's vacation pay, conditioned upon 80% attendance during the year "immediately preceding the annual vacation period", was payable forthwith. The Company thought such pay should be a reward for attendance during the contract year, and since this could be determined only at the end of the contract year, the Company proposed that in the new contract the second week's vacation should be payable in May 1950.

Third: *The third shift premium.* A 5¢ hourly differential had been granted by the Company when the third shift was initially instituted. Upon learning shortly before May 11 that the Union had signed a contract with another company giving up this provision, the Company sought a provision permitting discontinuance of the third shift premium if, in the opinion of the Company, such action was necessitated by competitive conditions.

Fourth: *Holidays.* The employees received time and a half for work done on

six holidays, under the 1948 contract. The Company sought to limit time and a half to four holidays and allow straight time as to the other two should this be necessitated by competitive conditions. As in the case of the third shift premium, this was proposed because of recent information that the Union had made such an agreement with another company.

Fifth: *The check-off.* The 1948 contract contained a provision for voluntary deduction of dues. The Company wanted to discontinue this collection of money, but on May 12 it promised to continue the check-off if the Union would agree to the four preceding demands. This conditional proposal was joined with an ultimatum that if the Union went on strike the Company would thereafter refuse to embody a check-off clause in the new contract.

It is perhaps more accurate to say that on May 12, only four of the issues listed above stood in the way of an agreement between the parties because the Company explicitly stated on May 12 that it would not insist upon the elimination of the check-off if its other four proposals were accepted.

The Examiner's conclusion that the Company was engaged in a sham performance, even before the strike, was based largely on the Company's changes of position, without notice, during the bargaining process, "thus making it virtually impossible for the Union to know what the issues in fact were"; and he placed special emphasis upon the Company's introduction of three additional issues on the eve of the termination of the old contract.

In our view there is nothing whatever in the record to justify the finding that the Union was unable to ascertain the Company's proposals or to resist them if desired to do so. The Union representatives, led by Lewis M. Conn, North Carolina Director of the Textile Workers Union of America, on and after May 11, were competent and alert and obviously able to take care of the interests of the employees. Nor was it reasonable to infer bad faith from the introduction of the three issues on the day before the contract expired.

One of these issues was speedily eliminated, as we have seen; and the ground upon which the other two were based was the subject of an explanation which was not only credible, since it was not denied, but was also reasonable since the purpose was to give the Company the same favored position enjoyed by a competitor. The more important of the two proposals related to the premium paid third shift workers which the Company originally granted of its own initiative and did not propose to abolish but desired merely the right to do so if, in its judgment, competitive conditions should require it. When these facts are taken into consideration it is obvious that no basis other than conjecture remains for the Examiner's finding of bad faith on the Company's part; and on review it is of the utmost significance that the Examiner took no notice of these important facts in stating the reasons for his conclusions.

Moreover, the Examiner in his discussion of this point did not mention the frequent changes of position of the Union during the bargaining process. For example, the Union by May 12 had given up its claims for health and accident insurance, a freeze of the existing scale of wages for six months, an increase in the overtime payment for work on six holidays, and an extension of the Company's vacation plan set out in the 1948 contract. In addition the Union changed its position on the important matter of check-off three times before the end of the strike. On March 31 it asked for an irrevocable check-off. By May 12 this position had been abandoned, and on October 6, when the strike was nearing its end, the Union asked if the Company would yield on other points if the Union surrendered the check-off. These changes in position do not in our opinion indicate a lack of good faith on the part of the Union but merely constitute what may be reasonably expected during bargaining conferences when both parties are endeavoring to improve their positions and are engaging in the normal give and take which characterizes the negotiations. It is only reasonable to view the shifting positions of the Company in the same light,

and the failure of the Examiner to consider the Union's conduct in this respect convinces us that his final conclusion was based on a partial view of the case. In short, we find no substantial evidence that the strike was caused by the Company's refusal to bargain or by any unfair labor practice on its part, but rather that the Union called the men out in order to secure the acceptance of its views in an economic dispute.

### Activities of the Parties During the Strike Period May 12 to November 27, 1949.

All operations at the mill ceased as the result of the strike and the Union maintained pickets around the plant. On August 4, the Company applied for and on September 12, received an injunction from the State Court against the Union and 160 odd individuals prohibiting mass picketing. In September an attempt was made to re-open the plant which was resisted by strikers and resulted in prosecutions for contempt against a large number of them, as will be hereinafter more fully described. The Company was consequently unable to operate the plant with more than one shift until November 28, when the strike was called off.

Meanwhile, negotiations between the Union and the Company were resumed. The first conference took place on June 2, followed by others on June 14, June 27, August 2, September 22, October 6 and October 19. On June 2, the Company offered two weeks' vacation with pay for the second week at the end of the contract year, and offered to return to the terms of the 1948 agreement with regard to fatigue time, and on this date, after the conclusion of the meeting, sent a letter to the Union making certain other modification of its demands. On June 14, there were concessions on both sides so that the only outstanding issues remaining related to overtime pay on holidays, the second week's vacation with pay, reduction in piecework guarantee, the elimination of the third shift premium, the no-strike clause and the check-off. Further concessions were subsequently made so that by September 22

three issues only separated the parties, that is to say, the no-strike clause, the check-off and the pieceworkers' guarantee. Upon these issues the Company remained adamant to the end and would make no concessions.

The Examiner found in the Company's firm position in these respects additional evidence that the Company never intended to enter into a contract, and that its bargaining activities were not performed in good faith. In support of this conclusion various incidents which occurred during the negotiations are narrated. There were angry interchanges at times between the representatives of the two parties and expressions of indifference on the part of Carter as to whether the mill operated or not under prevailing business conditions, and an assertion that the Company stood firm upon the three issues. Various inquiries were made by representatives of the Union and also by the Governor of the State who later called the parties into conference in an endeavor to settle the strike. The Company refused to accept the 1948 contract with the exception of the three issues, and to submit them to arbitration. In reply to an inquiry the Company rejected a suggestion of the Union that it might eliminate the check-off if the Company would accept the 1948 contract on the other two points. At the same meeting Carter said that he supposed that he would sign a contract if the Union surrendered on all three issues but he would have to consult other persons before he could answer definitely. Again on October 6, in conference with the Governor, Carter declined to agree to abandon the pieceworkers' guarantee upon condition of the surrender by the Union of the other two issues, and also declined to accept a surrender of the check-off as a condition of conceding the other two issues. He was willing to accept an offer of the Governor to conduct through an impartial state official an election to determine whether the Union represented a majority of the workers; but he was unwilling to agree to renew the 1948 contract for the ensuing year if the Union won the election. In short, the Company stood firm to the end upon its

demand that in formulating an agreement for the current year its position on all three of these issues should be accepted.

Two of these three matters were doubtless of importance to the Union even though late in the negotiations, after the Company had been able to resume operations under the protection of the State Court, the Union made hypothetical offers which seemed to indicate a willingness to surrender their position in these respects. Nevertheless, we do not find in the refusal of the Company to change its attitude such a recalcitrance as to justify an inference of bad faith on its part. The recent unfortunate experience of the Company growing out of the strike had not encouraged it to believe that it would benefit either the workers or itself in assisting the Union to collect dues from the members. The Company was not unwilling before the strike to sign a contract with check-off and strike clauses satisfactory to the Union and prevalent in other parts of the country, whatever may have been the general practice in the South.[3] Nevertheless a strike had been called over comparatively minor matters when business conditions were good enough to warrant the employment of three shifts at wages and under working conditions among the best in the textile industry in the South. For months after the strike, the gates of the shop were blocked by a mass of pickets, 30 or 40 men were convicted of assaulting persons who desired to work, 3 persons were convicted of assault with deadly weapons by firing bullets into the house of a watchman of the Company, 1 person assaulted the general manager by striking him in the face, 160 persons were enjoined from interfering with the Company's operations, and 53 persons were convicted of contempt of court.[4] It was not until a court order was secured that the Company was able to resume operations.

In the midst of these disturbances the Union published articles, called a public meeting and appealed to the Governor of the State in an endeavor to place the onus upon the Company for bringing about the strike with its attendant dangers and the loss of money to the community. These circumstances plainly should be taken into account in searching for the motive for the Company's stand and in determining whether it should be condemned for unlawful conduct. Nevertheless, the Examiner failed to consider or discuss this aspect of the situation, so that here again he based his finding upon a partial view of the whole evidence of the case. It has been repeatedly held that the Labor Board is not clothed with power to compel an employer against his will to accept the terms of a contract offered by the union, and the firm position of the Company during the strike when it was being fought with every weapon in the Union's arsenal cannot be reasonably interpreted as evidence of bad faith on its part.

Nor do we find anything in the refusal of the Company to bargain with the Union in respect to Company houses to justify the order of the Board. During the first bargaining conference on March 31, Carter told the Union representatives that the Company was considering selling some of its houses; but the Union did not evince any desire to discuss the matter. On July 6, during the strike, a newspaper article carried an interview with Carter to the effect that the Company had more houses than it needed; that it was willing to provide houses at a low rental for its workers, but when the occupants were unwilling to work the Company was obliged to protect itself. This article disturbed the tenants, who were on strike, and on July 29, for the first time, Conn by telephone and by letter requested a conference to discuss the subject. In the telephone conversation Carter said that he was not sure that the Company wanted to bargain about the houses, but by letter of July 30 he wrote that the Company had no intention of going on with the sale of the houses inasmuch as the employees were in no financial condition to purchase them. At the August 2 conference Conn submitted a contract clause which

---

3. See 29 N.C.Law Review, 81, 83.

4. See Hart Cotton Mills, Inc., v. Abrams, 231 N.C. 431, 57 S.E.2d 803.

would have required the Company to confer with the Union as to any proposed change in housing matters; but Carter said housing was not a bargaining matter and again asserted that the Company did not intend to sell the houses or change the rental charges at that time or any time in the future. From that point on Union representatives never mentioned the subject again. On October 25, another interview with Carter appeared in the daily paper in which he said in substance that the Company maintained the village only for the benefit of employees who worked and that the Company believed that the workers had had ample time to decide whether they wanted to work and thereby continue to live in the houses. He pointed out that none of the employees on strike had paid any rent since May and that the Company did not see how the strikers could expect the Company to continue to furnish them with houses.

■ In our opinion, the Company's contention that company houses are not a proper subject of negotiation with a union representing the employees cannot be sustained as a general proposition. In many mills such houses are a necessary part of the enterprise and in this instance they were maintained by the employer and rented at such rates to the employees as to represent a substantial part of their remuneration. It follows that the subject is one in which the employees have so great an interest in connection with their work that it should be a subject of bargaining between the employer and the representatives of the men. Cf. W. W. Cross & Co. v. N. L. R. B., 1 Cir., 174 F.2d 875; Inland Steel Co. v. N. L. R. B., 7 Cir., 170 F.2d 247, 12 A.L.R. 2d 240.

■■ It is, however, obvious when the whole story is reviewed that housing disappeared from the bargaining field as a practical matter and presented no obstacle to the formation of a new contract. Furthermore, it cannot be denied that the Company had the legal right to regain possession of the houses occupied by the strikers if it saw fit to do so; and that instead of exercising this right it permitted the strikers to occupy its houses, rent free; and

that the Union had been advised in writing at the end of July that the Company had no intention of selling the houses. We see nothing improper nor unlawful in the warning given to the strikers by the Company three months later that they could not expect to continue to occupy the houses indefinitely without working in the plant or paying rent. An employer, guilty of no act denounced by the statute, does not lose the right to protect and continue his business by filling places left vacant by strikers. National Labor Relations Board v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345, 58 S.Ct. 904, 82 L.Ed. 1381. It becomes obvious that the Examiner's conclusion, that the Company's conduct in regard to the houses amounted to unlawful intimidation and coercion of the workers in violation of Section 8(a)(1) of the Act, is without a reasonable basis either in fact or in law.

The Board's case in our opinion cannot be pieced out or strengthened by taking into account other actions of the Company during the strike which are described in the Examiner's report. At 10 p. m. on May 12, after the negotiations had broken down and the agents of the Union were about to advise the assembled employees to strike, the Company posted a notice in the mill advising the employees that in case of a strike the mill would be open for any employee to come in and work who wished to do so, and offering protection against any one who, in violation of the law, should attempt to threaten or molest him. Included in the notice was the statement that there was no intention on the Company's part to reduce anybody's wages or change to his disadvantage any of the terms and working conditions under which he had been working.

On May 24, the Company published a full page advertisement in a daily newspaper at Tarboro in which it undertook to answer a statement and handbills published and distributed by the Union, alleged by the Company to contain false and malicious statements as to the Company's position on the issues of two weeks' vacation pay, the number of holidays carrying overtime pay, the protection of the rate of pay of workers upon change of work assignment and a guarantee of existing wage rates. The ad-

vertisement set out the position which the Company had taken on these matters during the bargaining process and stated that, although the prosperity which had existed a year ago in the industry had completely disappeared, the Company had no intention to cut the wages or benefits of any employee. Specifically, the Company denied the Union's statement that the Company was refusing to continue the third shift premium, and announced that it would continue to pay the premium but did not want to be compelled to continue it for the entire year if conditions should otherwise require.

On June 16, 1949, the Company sent a letter to each of its employees stating its understanding that a great many employees desired to return to work but were prevented from doing so by pickets massed at the gates. Each employee was asked, if he desired to do so, to sign a paper enclosed to the effect that he desired to go to work but had not done so on account of the pickets. The letter contained the statement that if the employee was on strike because of his allegiance to the Union, it was his right and privilege to do so and the Company was not trying to persuade him otherwise. The superintendent of the mill was endeavoring to establish a work force to get the mill going and had been inquiring amongst the strikers as to whether they wanted to go back to work. He instructed his overseers and second hands if they got into conversation with the employees to ask them if they wanted to go back to work but not to insist upon it if they did not want to do so. The general manager instructed the superintendent and the overseers to pass the word along to the supervisory force that the Company would take back the strikers who desired to return to work but it was emphasized that no pressure was to be put upon any of them.

On September 12, 1949, the State Court enjoined the strikers from interfering in any manner with any person who wished to go in or out of the gates of the plant, and the next morning the Company published a full page newspaper advertisement describing the court's action and announcing that the next morning the mill would commence operation and would take all of its employees back. The notice concluded with the statement that "everbody's wages and other benefits would be the same as they were before the strike began."

The Examiner contends that the Company's advertisements of May 24 and September 13 offered to the individual strikers better conditions if they would return to work than the Company had offered to the Union in respect to vacation pay, the third shift premium, holidays and the pieceworkers' guarantee. The comment is correct with regard to some details at the time that the advertisements appeared but it does not present a fair picture of the whole situation. The bargaining between the Company and the Union was still going on and the terms offered the strikers did not differ from those submitted to the Union at subsequent conferences. Moreover, the terms offered the Union did not differ greatly from those actually enjoyed by the employees when the strike occurred. It is of course well established that an employer may not ignore an accredited union as the bargaining representative of the workers, and may not endeavor to undermine its authority by offering the workers directly better terms than they are enjoying. Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007; Great Southern Trucking Co. v. N. L. R. B., 4 Cir., 127 F.2d 180, 186. But it must be remembered that the Union was engaged in a campaign to discredit the Company in the eyes of the strikers and of the general public and was apparently giving its support to the unlawful conduct of the strikers. It is in this setting that the conduct of the Company should be appraised and it should not be adjudged guilty of unfair labor practice if, in the course of public debate, conducted in a tense and confusing situation, it may have overstated its case in some detail.

Finally we consider the Examiner's finding that the Company violated Section 8(a)(1) of the Act through the actions of four supervisors who interviewed certain strikers and endeavored to induce them to return to work by promises or threats. Eight employees out of a total of 557 were found to have been approached in this manner. The communications alleged to have been made

974

were to the effect that if the striker would go back to work at the Company's request, his job would be easier than if he went at the Union's direction; or that the striker would get his vacation pay; or that the payment of compensation for injury would be facilitated; or that if the striker did not return his job would be filled by another, and that the Union would never get a contract. The four supervisors denied that they had made these statements; but the Examiner, while setting out the testimony of the strikers in some detail, disposed of the opposing testimony with the curt footnote "most of the statements quoted herein were denied in whole or in part by the supervisor involved."

The Company's testimony showed that Carter had authorized its supervisory force to attempt to secure workers to operate the plant in spite of the picket line; but that he directed the general superintendent to order the supervisors not to use any pressure on the employees and that no supervisor was authorized to make such statements as were above described and that the statements alleged to have been made never came to the attention of the Company. The Examiner did not reject this testimony but held it to be immaterial. In addition the Company during the hearing tendered for cross examination as witnesses all the strikers, 240 in number, who had returned to work during the strike, who would testify that the Company did not in any way intimidate, coerce or improperly influence them. There was in fact no testimony that any striker had been influenced by the statements.

It is obvious that the circumstances related, assuming that they occurred, are too insignificant in the sum total of Company and Union activity during the strike to warrant any finding prejudicial to the employer. It is true that an employer's responsibility for the acts of his supervisory employees is not determined by applying principles of agency or *respondeat superior* but by ascertaining whether the conduct or activity is condemned by the Act. In H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 521, 61 S.Ct. 320, 323, 85 L.Ed. 309, the court said: "The question is not one of legal liability of the employer in damages or for penalties on principles of agency or *respondeat superior*, but only whether the Act condemns such activities as unfair labor practices so far as the employer may gain from them any advantage in the bargaining process of a kind which the Act proscribes. To that extent we hold that the employer is within the reach of the Board's order to prevent any repetition of such activities and to remove the consequences of them upon the employees' right of self-organization, quite as much as if he had directed them."

An employer cannot escape responsibility for the wrongful acts of his employees by asserting that they disobeyed his explicit instructions. North Carolina Finishing Co. v. N. L. R. B., 4 Cir., 133 F.2d 714, certiorari denied 320 U.S. 738, 64 S. Ct. 39, 88 L.Ed. 437; N. L. R. B. v. Bird Mach. Co., 1 Cir., 161 F.2d 589. But isolated statements by supervisors, contrary to the proven policy of the employer and neither authorized, encouraged nor acquiesced in by him, do not constitute substantial evidence of interference or coercion. N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 341, 342, 59 S.Ct. 508, 83 L.Ed. 682; N. L. R. B. v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796; E. I. Du Pont De Nemours & Co. v. N. L. R. B., 4 Cir., 116 F.2d 388; Quaker State Oil Refining Corp. v. N. L. R. B., 3 Cir., 119 F.2d 631; Wilson & Co. v. N. L. R. B., 7 Cir., 120 F.2d 913; N. L. R. B. v. Standard Oil Co., 10 Cir., 124 F.2d 895.

The Board's case in summary rests upon the basic premise that the Company went through the motions of collective bargaining with its tongue in its cheek, never intending to reach an agreement with the Union. This conclusion is directly in conflict with the Company's practice during the three preceding years, and is based, as we have seen, upon inferences drawn from parts of the evidence while other parts of great significance have been ignored. We are therefore compelled to deny enforcement of the order because under the Labor Management Relations Act, the findings of the Board are conclusive on questions of fact only when supported by substantial evidence on the record considered as a whole. 29 U.S.C.A. § 160(e); and it is the

duty of the reviewing court, under the Administrative Procedure Act, to set aside agency findings and conclusions found to be not in accordance with law or unsupported by substantial evidence; and in making these determinations the court is required to review the whole record. 5 U.S.C.A. § 1009 (e). We are warned by the decision of the Supreme Court in Universal Camera Corp. v. National Labor Relations Board, 340 U. S. 474, 490, 71 S.Ct. 456, 466, that under these statutes "courts must now assume more responsibility for the reasonableness and fairness of Labor Board decisions than some courts have shown in the past. * * The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." [5]

We do not mean to suggest by referring to the methods pursued in the effort to win the strike that unlawful or violent conduct on the part of employees on strike will condone unfair labor practices on the part of an employer. Unlawful conduct on the part of strikers lies within the scope of prohibitory state laws notwithstanding the enactment of national labor statutes. International Union U.A.W. Local 232 v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651; Berkshire Knitting Mills v. N. L. R. B., 3 Cir., 139 F.2d 134, certiorari denied 322 U.S. 747, 64 S.Ct. 1158, 88 L.Ed. 1579; N. L. R. B. v. Mt. Clemens Pottery Co., 6 Cir., 147 F.2d 262.

Nevertheless the acts of an employer when confronted by such an emergency cannot be appraised without taking into account the whole situation. Indeed the right of the employer to discharge strikers and the right of strikers to reinstatement may depend upon their actions. N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627; N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S. Ct. 508, 83 L.Ed. 682; Standard Lime & Stone Co. v. N. L. R. B., 4 Cir., 97 F.2d 531; N. L. R. B. v. Clinchfield Coal Corp., 4 Cir., 145 F.2d 66, 155 A. L. R. 874. Hence the violent acts of the strikers in this case must be taken into consideration in determining whether the Company was within its rights in publishing the advertisements and communicating with the strikers, and indeed in warning them that their employment with the Company was jeopardized by their acts. This position is fortified by the express provision of Section 158(c) of the Labor Management Relations Act, which provides that the expression of any views, argument or opinion or the dissemination thereof shall not constitute or be evidence of unfair labor practice if it contains no threat of reprisal or force or promise of benefit. Indeed it was established prior to the Act that the National Labor Relations Act did not prevent an employer from expressing its view on labor policies or problems. National Labor Relations Board v. Virginia Electric & Power Co., 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348; N. L. R. B. v. Clarksburg Pub. Co., 4 Cir., 120 F.2d 976, 979.

The petition of the Board will be

Dismissed.

5. See also N. L. R. B. v. Pittsburgh S. S. Co., 340 U.S. 498, 71 S.Ct. 453, in which on the same day the Supreme Court applied the rule in affirming a decision of the Court of Appeals which rejected findings of fact of the Labor Board; and see Judicial Review: "Substantial Evidence on the Whole Record" by Louis L. Jaffe, 64 Harvard Law Review, 1233.