**NATIONAL LABOR RELATIONS BOARD**
**v. NORFOLK SHIPBUILDING &**
**DRYDOCK CORP.**

No. 5826.

United States Court of Appeals
Fourth Circuit.

Argued March 5, 1952.

Decided April 3, 1952.

Julius G. Serot, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., and Jacques Sch'urre, Atty., National Labor Relations Board, Falls Church Va., on the brief), for petitioner.

John H. Morse, New York City (Leon T. Seawell, Sr., Norfolk, Va., on the brief), for respondent.

Before PARKER Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This case is before us upon a motion of the National Labor Relations Board (hereinafter called the Board) for an order directing the Norfolk Shipbuilding and Drydock Corporation (hereinafter called Respondent) to show cause why it should not be adjudged in civil contempt because of its alleged failure and refusal to comply with a decree of this Court dated January 26, 1949, ordering the enforcement of an order of the Board directed to Respondent. National Labor Relations Board v. Norfolk Shipbuilding and Drydock Corporation, 4 Cir., 172 F.2d 813. On March 28, 1949, this Court denied the Respondent's motion for a rehearing.

The gravamen of the Board's motion seems to lie in the charge that, in defiance of the Board's order and our decree, the Respondent has defiantly and contumaciously refused to bargain with the Union in good faith. From the Board's Memorandum in Support of Motion we quote:

"It was not until a month after the Union's request that respondent consented to meet with the Union. The first meeting was held on May 17, 1949. Since then, the parties have met in innumerable conferences but, throughout, respondent has steadfastly refused to bargain in good faith. As the facts described below show, respondent not only resorted to such familiar tactics as (a) frustrating agreement by repeatedly injecting new issues into the negotiations, (b) repeatedly refusing for months at a time to continue negotiations, (c) unilaterally changing wages during negotiations, and (d) undermining the Union by appealing directly to the employees, but it adamantly insisted, as a condition precedent to a contract, (1) that the Union contract away rights guaranteed by the Act, (2) that the Union assume responsibility for the unauthorized conduct of employees, including responsibility for the conduct of employees who were not members of the Union, and (3) that the contract expressly reserve to respondent the right to take unilateral action, during the

contract term, with respect to essential terms and conditions of employment. Throughout the negotiations respondent took the position that, in effect, it would not fix the wages and hours of employment for the contract term."

When the Board's motion was filed we directed that it be set down for hearing and that the parties file briefs directed thereto. We did this, instead of issuing a show cause order upon the filing of the petition, because of the view entertained by the court that its process in contempt proceedings should not be used as an adjunct of collective bargaining but should issue only when there was probable cause to believe that parties had in fact been guilty of real contempt of court. The Board has filed an affidavit of one Gerson, Regional Director of the Union, in support of the petition, and Respondent, in addition to a brief, has filed affidavits in support of the position that it has bargained in good faith, attaching thereto as exhibits the written proposals made by the parties in the course of the bargaining. We have heard extended arguments on the merits; and in the light of these arguments and of the facts disclosed by the affidavits, we do not think that probable cause for believing that respondent has contumaciously refused to bargain in good faith has been shown or that a further inquiry into the charge of contempt would be justified.

The affirmative duty imposed upon Respondent by our Court's decree, and the Board's order which that decree enforced, was to bargain collectively with the Union. The keystone of such collective bargaining is "good faith," though the National Labor Relations Act nowhere expressly defines that term. Under the National Labor Relations Act, 61 Stat. 140 (1947), 29 U.S.C.A. § 158(d),

"* * * mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and

the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession".

As Chief Justice Hughes said, in the great case of National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 45, 57 S.Ct. 615, 628, 81 A.L.R. 893;

"The Act does not compel agreements between employers and employees. It does not compel any agreement whatever."

See, also, the opinion of Judge Soper, in National Labor Relations Board v. Hart Cotton Mills, 4 Cir., 190 F.2d 964, 971.

Our Court has frequently made it clear that we will not use the process of contempt to force an employer, at the instance of the Board, to enter into a particular contract which the Board presses and advocates. We have also made it clear that if an employer defiantly or contumaciously refuses to carry out our decree, we shall not hesitate, in criminal contempt proceedings, to imprison individuals guilty of such contempt. Nor will we permit employers to evade our decrees by shifty and evasive tactics which evidence bad faith.

Respondent's history in its relations with its employees has not been too happy. In National Labor Relations Board v. Norfolk Shipbuilding and Drydock Corporation, 4 Cir., 1940, 109 F.2d 128, we modified an order of the Board and directed its enforcement as modified. Respondent was before us again in Employees' Protective Association of Norfolk v. National Labor Relations Board, 4 Cir., 1945, 147 F.2d 684. Then there is the instant case.

It is not without importance that though more than three years have elapsed since our decree, no contract has yet been entered into between the Union and Respondent. It does not necessarily follow, however, that the Respondent is solely, or even primarily, at fault. To the Board's contention that a contract should be signed embodying those points on which a tenta-

tive agreement has been reached, Respondent answers that those points are largely concessions to the Union which Respondent is willing to make if, but only if, the Union makes certain concessions desired by Respondent. Parties to such collective agreements may decline to be bound by preliminary agreements with regard to specific clauses. National Labor Relations Board v. Landis Tool Co., 29 L.L.R.M. 2255; Exposition Cotton Mills, 76 N.L.R. B. 1289.

The Board, in its Motion and Supporting Brief, continually insists that Respondent was adamant and unyielding; that it insisted, as a prerequisite to entering into any contract with the Union, upon utterly unreasonable and absolutely unfair concessions from the Union. We cannot, in detail, go into all the Board's specific charges, so we content ourselves by adverting briefly to what we consider the most important of these charges.

The first bargaining conference between the Union and Respondent was not held until May 17, 1949, though our opinion was handed down January 26, 1949, and Respondent's Motion for Rehearing was denied on March 28, 1949. For this delay, Respondent has at least some excuse in the pendency of decertification proceedings, which were subsequently dismissed by the Board. Respondent was not advised of this dismissal until May 4, 1949.

▆ As to the unwillingness of Respondent to meet with the Union in bargaining conferences, it is clear that during the years 1949, 1950 and 1951, 35 such conferences were held, some of them very lengthy, running all day and sometimes into the evening, while, in some instances, offers by the Respondent to hold such conferences were ignored by the Union. It has frequently been held that willingness of an employer to meet with the Union, manifested in numerous conferences, is an indication of good faith. National Labor Relations Board v. Corsicana Mills, 5 Cir., 179 F.2d 234; National Labor Relations Board v. P. Lorillard Co., 6 Cir., 117 F.2d 921, 924.

Respondent kept the Board constantly apprised of the progress of the bargaining negotiations. On frequent occasions, Respondent sought and followed the advice of Examiner Humphrey and Regional Director Penello of the Board. In some instances, these Board officials expressed approval and commendation for Respondent's course of conduct.

The submission of counter-proposals by Respondent is some evidence of good faith. H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Montgomery Ward & Co., 9 Cir., 133 F.2d 676, 146 A.L.R. 1045. See, also, Ward, "The Mechanics of Collective Bargaining," 53 Harv.L.R. 754, 773. Thus Respondent submitted three different forms of the loyalty clause, all of which were rejected by the Union, which did not submit its own proposal on this subject.

Another evidence of good faith is the willingness of Respondent to make substantial concessions. Cincinnati Steel Casting Co., 86 N.L.R.B. 592; Southern Prison Co., 46 N.L.R.B. 1268. Thus, if Respondent's counterproposal of June 26, 1951, is compared with the draft of August 17, 1949, it is manifest that, on many points, the counterproposal is more favorable to the Union than was the earlier draft.

In November, 1949, the Union broke off negotiations, which were resumed in July, 1951, when the suggested contract was reviewed, article by article. A spokesman of the Union stated there was no need for further negotiations and refused to attend a meeting scheduled for the next day. When a genuine impasse is reached, an employer, unless conditions change, usually may abstain from further negotiations. National Labor Relations Board v. Algoma Plywood Co., 7 Cir., 121 F.2d 602; National Labor Relations Board v. Sands Manufacturing Co., 6 Cir., 96 F.2d 721; National Labor Relations Board v. Remington Rand, 2 Cir., 94 F.2d 862.

The point that gives us gravest concern is the Board's charge that Respondent, by insisting that the contract must contain certain specific clauses, alleged by the Board to be unreasonable and in some instances even unlawful, acted in bad faith

and thus prevented any real collective bargaining agreement.

Strenuous objection is interposed by the Board to Respondent's proposed Management Functions 'Clause, with particular reference to the right of Respondent, under this proposed clause, to promote and demote employees, to create new jobs (under certain circumstances), classifications, rates and standards, to change (with express limitations) hours of work and shifts. In this connection, there is obvious force in Respondent's suggestion that, unlike many industries,

> "* * * the work of a ship repair yard frequently depends upon wholly unpredictable external events, over which the repair firm has no control. Ships requiring emergency repairs may dock at any hour of the day or night. Ships expected to arrive at a certain hour may be unavoidably delayed by fog, wind or other conditions. Delay in repairing these vessels is expensive, impairs the reputation of the yard and inevitably results in loss of business to the yard."

Ships, too, are very valuable and speed in making repairs to them, so that they may again be put in use, is of the utmost concern. See, in this connection, National Labor Relations Board v. Hart Cotton Mills, 4 Cir., 190 F.2d 964; National Labor Relations Board v. Berkeley Machine Works, 4 Cir., 189 F.2d 904; American National Insurance Co. v. National Labor Relations Board, 5 Cir., 187 F.2d 307; Inland Steele Co. v. National Labor Relations Board, 7 Cir., 170 F.2d 247, 12 A.L.R.2d 240; National Labor Relations Board v. J. H. Allison Co., 6 Cir., 165 F.2d 766, 3 A.L.R.2d 990; Timken Roller Bearing Co. v. National Labor Relations Board, 6 Cir. 161 F.2d 949; Teller, "Management Functions under Collective Bargaining" 47.

The heaviest guns of the Board are apparently levelled at Respondent's proposed "no strike" clause. As originally proposed by Respondent, this Union responsibility extended to all employees in the bargaining unit and applied to all unauthorized and authorized stoppages alike. Two changes were made in this clause·by Respondent, and in August, 1951, Respondent modified this clause, which it now continues to demand, so as to read in pertinent parts as follows:

> "Section 2. During the life of this Agreement neither the Union nor any of its officers, agents or representatives nor any employee in the bargaining unit shall engage in, prolong, sanction, or encourage any strike, work-stoppages, slowdown or other interference with or curtailment of work or production.

> "Section 3. * * * The Union shall be liable for any violation of Section 2 of this Article by any of its officers, agents, representatives or members.

> "Section 4. * * * any violation of Section 2 of this Article shall give to the Company the right to terminate this Agreement immediately by giving notice in writing thereof to the Union."

Thus Respondent has removed from the coverage of the Union financial liability section the provision that the Union would be financially liable for the conduct of non-union employees. But under this clause, the Union still remains financially liable not only for its own acts and those of its officers, agents and representatives, but also for the acts of any union member whether or not the Union authorizes or ratifies his misconduct. Much is made, too, of Respondent's apparent unwillingness to accept the so-called Bethlehem Shipyards No Strike Clause, which seems to be somewhat standard in the ship repairing industry.

The law seems clear that No Strike clauses imposing some liability on the Union are in themselves neither illegal nor convincing proof of lack of good faith on the part of employers proposing them. Not quite so clear is just how far these clauses may properly go. Cf. National Labor Relations Board v. Hart Cotton Mills, 4 Cir., 190 F.2d 964; National Labor Relations Board v. Tower Hosiery Mills, 4 Cir., 180 F.2d 701. See also, Shirley-Herman Co. v. International Hod

Carrier's Union, 2 Cir., 182 F.2d 806, 17 A. L.R.2d 609; National Labor Relations Board v. Corsicana Cotton Mills, 5 Cir., 178 F.2d 347; McQuay Norris Manufacturing Co. v. National Labor Relations Board, 7 Cir., 116 F.2d 748; Stewart Die Corporation v. National Labor Relations Board, 7 Cir., 114 F.2d 849, 856, certiorari denied 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119; Burns Brick Co., 80 N.L.R.B. 389; Shell Oil Co., 77 N.L.R.B. 1306.

■ We think these No Strike clauses must be viewed in the light of their severity upon the Union against the broad bargaining background in each case. In the instant case, the urgency of the time element in Respondent's work together with the drastic consequences of delay in repairing ships are important considerations. Here, too, there had been one strike that had failed and Respondent had distinctive reasons for wishing to avoid another strike by requiring the Union to be responsible for strike activities engaged in by members of the Union. We cannot say (in the light of the whole background) that the No Strike clause demanded here by Respondent was convincing evidence that its demand for this clause was purely *in terrorem* and indicated bad faith.

This brings us to the Board's charge of Respondent's "(c) unilaterally changing wages during negotiations, and (4) undermining the Union by appealing directly to the employees." Such practices clearly should not be encouraged. Here again there were distinctive conditions and peculiar circumstances serving to extenuate the conduct of Respondent. Petitions for wage increases on the part of many of Respondent's competitors had been favorably acted upon by the Wage Stabilization Board, so it became increasingly difficult for Respondent, under the existing wage-scale, either to obtain new employees or to retain those already in its employ. The Union was promptly informed of the situation at a bargaining conference on June 19, 1951. Not only did the Union refuse to consider the question of wage increases unless further concessions should be made by Respondent but the Union even wired the Wage Stabilization Board, urging that the wage increase be not approved.

The notices posted by the Respondent were largely factual, without threats or exhortations. There is ground for the view that the notices were posted, not for the purpose of undercutting the Union or impairing its usefulness, but rather in the belief that the employees, if fully and fairly informed, might remain in Respondent's employ, even in the face of higher wages offered elsewhere. Cf. National Labor Relations Board v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602.

■ In the light of all the facts that we have considered, the petition of the Board for an order to show cause why Respondent should not be found guilty of civil contempt is denied. This does not mean, of course, that respondent is absolved from the duty of bargaining as heretofore ordered, or that it would not be amenable to punishment for contempt if it should in the future fail to comply with the order.

Motion for Order to Show Cause Denied.